# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Dennis Gale Hubbard,**
**Petitioner Below, Petitioner**

**FILED**

**April 10, 2017**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 16-0148** (Mercer County 12-C-320)

**Ralph Terry, Warden,**
**Stevens Correctional Center,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Dennis Gale Hubbard, by counsel Paul R. Cassell, appeals the Circuit Court of Mercer County's January 20, 2016, order denying his amended petition for writ of habeas corpus. Respondent Ralph Terry,[1] Warden, by counsel Nic Dalton, filed a response. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in denying his amended habeas petition on the grounds of ineffective assistance of counsel, a change in the law since the time of his conviction, the failure to preserve certain evidence, and cumulative error.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In July of 2005, petitioner shot and killed Ricardo Edward Lee after Mr. Lee entered petitioner's residence. By his own admission, petitioner fired ten shots at Mr. Lee, emptying his firearm. During the February of 2006 term of court, petitioner was indicted on one count of first-degree murder. Petitioner's trial commenced in August of 2006. At trial, petitioner argued that he acted in self-defense and claimed that Mr. Lee was holding a knife at the time of the shooting. However, several witnesses testified that they did not see Mr. Lee holding a knife at the time of the shooting or see him move toward petitioner in a threatening manner. Ultimately, the jury convicted petitioner of one count of second-degree murder. Thereafter, petitioner filed a motion for a new trial, which the circuit court denied. By order entered in October of 2006, the circuit court sentenced petitioner to a term of incarceration of forty years. Petitioner thereafter appealed

---

[1]Petitioner originally listed Marvin C. Plumley, Warden of Huttonsville Correctional Complex, as respondent in this matter. However, petitioner is no longer housed at Huttonsville Correctional Complex and is, instead, housed at Stevens Correctional Center. Pursuant to Rule 41(c) of the West Virginia Revised Rules of Appellate Procedure, the name of the correct public officer has been substituted as respondent in this action.

1

his conviction to this Court, and we refused the same by order entered in September of 2008.

Petitioner filed a petition for writ of habeas corpus in May of 2010. The circuit court appointed an attorney to represent petitioner and he later filed an amended petition. Ultimately, the circuit court denied that petition in May of 2010. Thereafter, petitioner filed a second petition that the circuit court denied in October of 2010.

In June of 2012, petitioner filed a third petition for writ of habeas corpus in the circuit court. After the circuit court appointed counsel in February of 2013, the State conceded that petitioner received ineffective assistance of counsel in his prior habeas proceeding. As such, the circuit court permitted petitioner to file an amended petition. In November of 2014, the circuit court held an omnibus evidentiary hearing. The circuit court then permitted evidentiary depositions of fact and expert witnesses. In June of 2015, the parties presented their final arguments to the circuit court. By order entered on January 20, 2016, the circuit court denied petitioner's amended petition. It is from that order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

"In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal to this Court, petitioner argues that he was entitled to habeas relief due to trial counsel's ineffective representation, a favorable change in the law with retroactive effect, a violation of his state and federal due process rights by the State's failure to preserve certain evidence, and cumulative error. The Court, however, does not agree. First, the record is clear that petitioner's due process rights were not violated by the State's failure to preserve evidence. According to petitioner, a radio interview that he gave shortly after the crime was played for the jury during trial. According to petitioner, the individual who interviewed him indicated he worked for a radio station but may have actually been a police officer. Accordingly, petitioner argues that his due process rights and right to effective assistance of counsel were violated by trial counsel's failure to transcribe the entirety of the interview, especially in light of the fact that the State can no longer produce the recording. This Court, however, finds no error.

Importantly, petitioner provides no evidence in support of his allegation that his interviewer may have been a police officer. He further provides no argument as to how the recording in question would support this bald assertion. Instead, petitioner simply argues that there is a "presumption of prejudice" when "substantial and significant" portions of the record are omitted in situations where a defendant is no longer represented by trial counsel. *U.S. v. Preciado-Corbodas*, 981 F.2d 1206, 1212 (11th Cir. 1993). He also argues that this Court has

held that failure to ensure that crucial parts of the trial are on the record can constitute ineffective assistance of counsel. *Myers v. Painter*, 213 W.Va. 32, 37-38, 576 S.E.2d 277, 282-83 (2002). Simply put, the cases upon which petitioner relies are not persuasive, as they deal with situations unlike the one on appeal. Specifically, petitioner relies on cases that require a record be made for purposes of meaningful appeal and that govern instances of missing evidence that the State intends to use at trial or that was subject to discovery prior to trial. Petitioner has already had the opportunity to appeal his conviction, and this Court refused the same. Moreover, petitioner does not allege that the State improperly withheld the recording in question during discovery. In fact, the record is clear that petitioner received a transcribed version from his trial attorney. As such, we find no error in the circuit court denying petitioner habeas relief in this regard.

As to petitioner's remaining assignments of error, upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's January 20, 2016, "Order" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 10, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

16-0148

NOTED CIVIL DOCKET
JAN 20 2016
JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

# IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

DENNIS GALE HUBBARD,                                    PETITIONER,

V.                                    CIVIL ACTION NO. 12-C-320,

MARVIN C. PLUMLEY, Warden,                              RESPONDENT.

## ORDER

**FINDING OF FACT:**

1. On July 14, 2005, Dennis Gale Hubbard, his wife Virgie, their twenty-four (24) year old son, Trusby Edward Hubbard (Red) and one Jimmy Taylor resided at 120 Poplar St. in Bluefield, Mercer County, West Virginia. They had resided there since May 23, 2004.

2. On the evening of July 14, 2005, at approximately 2100 hours or 9:00 p.m. an incident was reported describing a shooting at 120 Poplar St. In Bluefield, Mercer County, West Virginia. Officers of the Bluefield WV Police Department, Officer S. Whitt and Officer J. Brooks responded to the report.

3. According to the report of Officer J. Brooks, when they arrived they found Ricardo Edward Lee, lying in the entrance to the residence. He observed a small kitchen knife lying beside Mr. Lee. Mr. Lee was wounded and, therefore, transported to the Bluefield Regional Medical Center where he died shortly after arrival.

4. Officer Brooks reported that he spoke with Dennis Hubbard who said he was downstairs of the residence and heard a commotion upstairs. He then went upstairs and observed

1

A1192

Mr. Lee on the porch of the residence with a knife. He asked Mr. Lee to leave several times and Lee refused. Mr. Hubbard stated that he closed the door and Mr. Lee kicked the door in and entered the home. Mr. Lee then advanced toward Mr. Hubbard with a knife. Mr. Hubbard shot Mr. Lee, firing the weapon about 10 times, but he did not know how many times he hit him.

5. Officer Brooks then spoke with another resident of the home, Trusby Hubbard. He related that he and a friend were entering the home when Mr. Lee attempted to enter with them. Trusby asked Mr. Lee to leave and attempted to close the door. Lee then pushed his way into the residence with a knife in his hand. Trusby yelled for his Dad, Dennis Hubbard, who came upstairs and told Lee to leave and when Lee failed to do so, his Dad shot him. The weapon used in the incident was a Hi Point .380 caliber handgun serial number P743288. Two weapons seized by the officers were the handgun and a 6 ½ inch Regent Bherewood kitchen knife. Both Dennis Hubbard and Trusby Hubbard were transported to the Bluefield Police Department where they were to be interviewed by Lt. Detective J. T. Helton

6. At this point in time Detective J. T. Helton entered the picture. He arrived at the Bluefield Police Department to interview Dennis and Trusby Hubbard. At 9:55 p.m. Dennis Gale Hubbard was advised of his constitutional rights and decided to waive them and talk with the Officer.

7. Dennis Hubbard stated he knew Ricardo Lee casually and he did not think he lived in the neighborhood. It was his understanding Mr. Lee lived somewhere in Virginia. Previous to this night he had told Mr. Lee to stay away from his home on numerous occasions. As recent as the day prior to the incident Ricardo Lee had barged into his home without his or his wife's permission. Mr. Hubbard stated that he warned Mr. Lee that "it better not happen again".

8. According to Dennis Hubbard, on the evening of July 14, 2005, Mr. Hubbard was alone and was in his basement working on a gardening implement. Trusby Hubbard, Mark Heaton and David Lee Pleasants (Spanky) came into the house and as they were shutting the door , Mr. Lee rammed the door and came inside the house. He heard a noise and a voice screaming for someone to get out of the house. Mr. Hubbard went upstairs to fine Ricardo Lee standing approximately five (5) feet inside his front door with a knife in his right hand. He was holding the knife in a threatening manner. Ricardo Lee was cursing Trusby Hubbard and saying he did

2

A1193

not have to leave the house. Ricardo Lee made a move toward Petitioner with the knife and Petitioner began firing his weapon. Petitioner fired it until it was empty.

9. Trusby Hubbard was also advised of his constitutional rights and he waived them and gave Lt. Helton a statement. He said that Ricardo Lee had been in his house on prior occasions and had even been in Trusby's bedroom which is in the attic. On the day before the shooting Ricardo Lee had just walked into the house, came up to Trusby's room in the attic wanting a beer or cigarettes. When Petitioner heard him he walked up to the attic and politely told Ricardo Lee to leave. He had to tell him to leave the house three (3) times before he left and on the way out he stole two baseball caps.

On the day of the shooting, Ricardo Lee and Spanky (David Lee Pleasants) were at a Frazier home next door to the Hubbard house. Trusby Hubbard went to the Fraser home to talk with Spanky (David Lee Pleasants). Frazier told Ricardo Lee and Spanky(David Lee Pleasants) to leave his home. When the left, Trusby and Spanky were going to the Hubbard home. When they entered the front door they saw Ricardo Lee immediately behind. Trusby Hubbard told Ricardo Lee that he would have to leave because he was not welcome in the house. Trusby was in the process of closing the door when Ricardo Lee put his hand inside. Ricardo then screamed and kicked the door open. Ricardo Lee had a knife in his hand. Trusby called for his father and then started up the steps to his bedroom. He did not see the shooting, but he heard the shots.

10. When Lt. Helton finished interviewing Dennis Gale Hubbard and Trusby Hubbard he proceeded to the home at 120 Poplar Street in Bluefield, WV. When he entered the home he found that the members of the Bluefield police department had not secured it as a crime scene. The front door had been secured; however, there were persons left in the house and the back door was left unlocked. Spent casings were scattered over the living room floor and some had been stepped on and damaged. Persons had been left in the house and it appeared they were in the process of cleaning the room prior to his arrival. Jimmy Taylor a resident of 120 Poplar Street had been left in the house and was in another room watching TV when he arrived. He had never been told to leave the house. He gathered spent casings and was able to locate only four (4) casings in the living room. He then photographed the scene and began taking a statement from Mr. Taylor.

3

A1194

11. Mr. Taylor said he was coming out of the bathroom and Ricardo Lee was standing inside the door and he and Petitioner were into an argument. Petitioner told Ricardo Lee to leave the house. Petitioner had a gun and Ricardo Lee had a knife. Petitioner repeatedly told Ricardo Lee to leave the house and Lee said he was not leaving until he checked on his friend. Petitioner began shooting. Mr. Taylor said that from a week or so prior to July 14, 2015, Petitioner had been telling Ricardo Lee not to come around his home and he had been coming around anyway.

12. On July 15, 2005, Lt. Helton spoke with Andrea Frazier who lived next door to the scene of the shooting. Frazier told him he left Spanky, Ricardo Lee and someone named Ronnie in his apartment and he went to the store. When he got back he saw smoke coming out of his door. Spanky and Ricardo Lee were smoking crack and he told them to leave. At that time Ricardo Lee had a knife on him when he was told to leave the apartment. He offered to sell it to Frazier for $10.00. He later heard shots and never saw Ricardo Lee again.

13. He also spoke with David Pleasants aka Spanky and he told him that he went to Andre Frazier's house and met Ricardo Lee. He and Ricardo Lee proceeded to Frazier's home so that Ricardo Lee could buy some crack. They went to the Hubbard house. He went inside and when Ricardo Lee tried to come in, Trusby told him not to come inside because he was a thief. Ricardo Lee then kicked the door open and came inside. Pleasants did not see a weapon in Ricardo Lee's hands. He and Trusby went upstairs and he heard Petitioner tell Ricardo Lee to get out five (5) or six (6) times and then he heard a series of shots. He left and went to his own home. At 3:00 p.m. Ricardo Lee did not have a knife on his person or he just would not let Spanky use it to repair a watch.

14. Lt. Helton later interviewed Thomas Hankins, a neighbor, who said he heard someone tell Ricardo Lee to get off the porch and that was all he heard.

15. Lt. Helton heard one Amy Stone was at the scene of the shooting, but he was never able to locate her.

16. Lt. Helton interviewed Chris Smith MDPS who was a polygraph operator whom he had contacted and asked to run Mr. Hubbard on the polygraph. After an extensive test, it showed Mr. Hubbard was being truthful when questioned about the knife in Ricardo Lee's hand.

17. In his report, Lt. Helton listed physical evidence consisting of (1) Highpoint .380,

4

AJ1195

serial number P743288 and (2) a 6.5 inch Bherwood kitchen knife.(3) Rights form and statement by Dennis Hubbard (4) Rights form and statement of Trusby Hubbard (5) Photos of scene and (6) Medical Examiner's report.

18. On or near August 7, 2005, Lt. Charles S. Myers of the Bluefield City Police Department submitted the knife and a fingerprint card bearing the name of Dennis Gale Hubbard to the West Virginia State Police Forensic Laboratory. The result of the examination was that there were no latent prints of comparison value developed on the submitted knife. The report was signed by Stephen C. King, Latent Print Examiner.

19. On or about July 16, 2005, the West Virginia Office of the Chief Medical Examiner received a request for a toxicology report on Ricardo Lee. The Pathologist is listed as Dr. Mahmoud and samples were submitted of subclavian blood, hospital blood, vitreous fluid, gastric contents and liver. An analysis was performed and the result was alcohol was present in the blood at a concentration of 0.17% with no drugs detected. The report was signed by James Kraner, Ph.D. Chief Toxicologist.

20. It appears that there was never a preliminary hearing before a magistrate in Mercer County, West Virginia with regard to charging Mr. Hubbard with a crime.

21. An indictment charging Dennis Gale Hubbard with First Degree Murder was returned by a Grand Jury of Mercer County, West Virginia at the February 2006 Grand Jury Term of the Mercer County , West Virginia, Circuit Court. Subsequent to that Indictment Elizabeth French, Esq. and James Palmer, Esq. licensed practicing attorneys in Mercer County, West Virginia, were appointed to serve as counsel for Defendant Dennis Gale Hubbard.

22. Prior to trial, counsel for Petitioner hired an investigator named Ms. Roebuck to take statements of Tammy Worley, Justin Hawkins, Tanny Hawkins and John Wayne Worley.

23. An individual named "Roebuck" interviewed Justin Clinton Hawkins on April 18, 2006. Hawkins stated he saw Petitioner walking up near Hardee's restaurant in Bluefield, WV. Hawkins was in a Pawn Shop and walked out on the street and accompanied Petitioner. As Petitioner and Hawkins came to the Adams residence they decided to stop. Hawkins stated that at no time did Petitioner say that he was going to "kill a nigger." Petitioner simply said hello and they moved on.

5

A1196

He said he first met Petitioner at Kroger's in Bluewell, WV when Petitioner was set up there to sell lawnmowers and repair items. Since that time they became good friends. He said Petitioner was a kind hearted man who would not hurt a fly. The Adams family said Petitioner related that he was going to "kill a nigger" only to collect a $10,000.00 reward . He said he knew Petitioner did not premeditate to kill Richard Lee. He stated that he was present at the Adam's residence when Petitioner allegedly made the statement and it simply did not occur.

He and Petitioner proceeded to walk down to Petitioner's house. He left about 30 or 40 minutes later.

Hawkins was aware of the $10,000.00 reward posters posted throughout the neighborhood, and he further stated that he took down those he saw. He believed the Adams' motive for making the statement relating to "killing a nigger" was the reward. He stated the Adams family were thieves, rogues and they would do anything for money. He further stated that Ricardo Lee was a crack head, needle jockey, a drunk and a thief. He was present when Petitioner and his wife had told Ricardo Lee to leave their house on several occasions. Petitioner did not take drugs, but he believed his son probably owed Ricardo Lee money for drugs. He had seen Ricardo Lee at Petitioner's house on several occasions.

They all lived in a high crime neighborhood , but Petitioner was not a violent man. On the other hand, he knew Ricardo Lee and Mr. Lee had threatened to kill him and was , in fact, a violent man.

24. Ms. Roebuck interviewed Tammy Lynn Hawkins on April 18, 2006. Ms. Hawkins is the mother of Justin Clinton Hawkins. She had known Petitioner for about 2 years. She does not believe the Adams' are credible people and further, does not believe Petitioner said he was going to "kill him a nigger." This was fabricated to collect the reward money.

25. Mr. Roebuck interviewed Tammy Lynn Worley on April 18, 2006. When asked about the Adams family she related that when she worked at the Trading Post in Bluefield, Pat Adams came in and bought a lamp and stole another. When she heard about the reward she became upset. She knew first hand that the Hubbards had a problem keeping Ricardo Lee off their property. She knew that the Hubbards had previously called the police to keep Mr. Lee away from their home.

6

A1197

She and her husband had told Petitioner that if anything happened to him they would try to post his bond. She believed Ricardo Lee was shot because he was threatening Petitioner. She knew that the Hubbards were upset because of all the drugs in their son, Trusby's room. But the Petitioner did not use drugs.

26. Ms. Roebuck interviewed John Wayne Worley on April 18, 2006. Mr. Worley told the investigator that about 6 to 8 weeks prior to Ricardo Lee being shot and killed by Petitioner his wife heard something downstairs in their home. One of their dogs started barking and his wife went downstairs to investigate. She hollered up stairs, "Buck, there's someone in the livingroom would you please bring a gun and come down here"? Mr. Whorley got his pistol and started down the steps and his wife said get out of my house now. Ricardo Lee was in our living room, our door was open and he was put out the door. He had to have come in through a window as the door had a deadbolt on it and a key was required to get in and get out. This was about 1:00 a.m.

Mr. Worley was a good friend of Petitioner and had witnessed him ordering Ricardo Lee off his property. It was not uncommon to see a group of "drugheads" around the Petitioner's house. Petitioner would run them off when he came home. He said he knew that Petitioner was scared of these people and he never dreamed he would ever shoot one of them. He never heard Petitioner say he was going to shoot someone. He said Petitioner was not a violent type and he tried to get along with everyone

Mr. Worley said, "Something I can say about Dennis, the short time that I had been friends with him he has always been outgoing, you know he's helped people in the neighborhood, he has worked on lawnmowers, weedeaters, chainsaws free. Just to help people out, he done things to work with the neighborhood watch, the neighborhood association and help his fellow neighbors. He's just all around good guy and you know I'm sorry that Ricardo Lee got shot but, he had to have been pushed into the situation because he would not of went out of his way to have done it."

27. The jury trial in State of West Virginia vs. Dennis Gale Hubbard, Indictment No. 06-F-139, commenced in the Circuit Court of Mercer County, West Virginia at 9:41 a.m. August 29, 2006.

28. Mr. George V. Sitler, Assistant Prosecuting Attorney represented the State of West Virginia,

7

A1109

and Elizabeth French and James Palmer represented the Petitioner. Both sides represented that they were ready to proceed.

29. The Court began voir dire with an explanation to the jury as to the procedure. He advised the jury that acoustics in the Courtroom were terrible and if they could not hear, they should just raise their hands. The defendant was in the Courtroom at that time.

30. During voir dire the State advised the jury that this case involved the shooting of a human being and it was a self defense case. He stated that the deceased could have been an uninvited guest or he could have been an intruder. He further asked if there was anyone on the panel who believed that the right to defend their home was absolute. That one has the right to use deadly force, no matter what the circumstances, against someone that you have not invited into your home.

31. Ms French began her voir dire with an introduction of herself and some information about her family. She also introduced Mr. Palmer and personalized him for the members of the jury with a discussion of his family and the fact that he is the pastor at the Mount Sinai Baptist Church. After the explanation of some surgery to the Petitioner she stated "...now the case that you are here for today involves self-defense, your right to not only protect yourself, but to do so within your own home. This is a simple, straightforward case. There is only one central issue upon which this case will turn and that is why did Dennis shoot Ricardo Lee?" (Tr. 30). She further explained the "burden of Proof" in an effective manner. (Tr. 51). She also stated "... the Judge will instruct you that it is –in order for the Prosecutor to win this case, he must prove beyond a reasonable doubt that when Dennis killed Ricardo Lee he was not acting in self-defense. And if you have a reasonable doubt about whether Dennis was acting in self-defense, you must find for Dennis with an acquittal." (Tr. 52). She then inquired about the drug problem in our society today. (Tr. 53). She discussed gun ownership for personal safety. (Tr. 55). She went into greater detail about gun ownership and personal safety. The voir dire presented by Ms. French attempted to endear herself, family, Mr. Palmer and Petitioner to the jury at an early stage. Inquired of jurors association with law enforcement, explained self defense, burden of proof, inquired as to gun bias and ownership, followed up on several jurors with individual questions and otherwise presented a competent and detailed approach to the case as did the States

8

A.1199

attorney.

32. When asked by the Court as to how many witnesses she might have, Ms. French stated that some of the State's witnesses were hers and that she may have 5 or 6 more. (Tr. 88).

33. After the jury was selected and sworn, the Judge excused them for lunch and told them when they returned they would hear the opening statements by the attorneys. "That's when each side gives you a brief outline of what they expect the evidence to prove so that you can better understand the testimony of the witnesses. What the lawyers say isn't evidence." He then related an explanation to them and added "But it's not the evidence." He further advised them that if they could not hear anybody, then to raise their hands. In explaining the stages of a trial, he said the fifth stage is the argument of counsel. He added "...what they say isn't evidence". (Tr. 113-115). Later he added, "...the opening statements are not arguments or evidence and should not be considered as such." (Tr. 119).

34. Later Mr. Sitler advised the Court that Ms. French was considering a motion for a jury view because the dimensions of the room where the shooting took place where somewhat critical in a self-defense case. He stated that he and Ms. French discussed that issue and decided to mark out the dimensions of the room here. They would lay it out on the floor of the Courtroom.

35. In his opening statement and among other things, Mr. Sitler told the jury that the defense here is self-defense, that Mr. Hubbard's wife had a key, left work and she went back to the scene and probably cleaned things up a little bit.

36. In his opening statement, Mr. Palmer told the jury that Ricardo Lee had been told not to come back to the Petitioner's house the day prior to the shooting. However, he came back, broke into the front door and was armed with a knife and was seeking drugs. Ricardo Lee was told 5 or 6 times to leave the house by Dennis Hubbard. He refused to leave, advanced toward Mr. Hubbard and was shot. He told them Ricardo Lee's blood alcohol was twice the legal limit. He said that Ricardo Lee had broken into a home in the middle of the night and there were other incidents as well. Mr. Hubbard was simply protecting his home and family. The opening statement made by Petitioner's counsel was reasonable and fully advised the jury of the events which took place on July 14, 2005, that were the subject matter of the trial. He further explained the Defendant's defense and the reputation of Ricardo Lee in an about the community.

9

A1200

37. The first witness called by the State of West Virginia was Lieutenant Tom Helton of the Bluefield, WV Police Department. He was employed by the Bluefield, WV Police Department on July 14, 2015 and in charge of the investigation. He was called by Sgt. Pennington at home and told of the shooting, that the scene was secured and the Petitioner had been taken to the police department. Allegedly Patrolman Whitt and Patrolman Brooks were the officers to initially responded to the report.

When he arrived at the police department he found Petitioner sitting in the hallway and he put him in an office while Officer Brooks told him what had transpired. Brooks told him there was a shooting involving Mr. Lee and Mr. Hubbard had shot Mr. Lee. He further stated he had secured a knife and pistol from the scene, which were at the police station and that they had locked the house when they left. Lt. Helton advised Petitioner of his rights and began taking a statement from him. There were indications in the statement that it was a self-defense shooting. Mr. Hubbard told him that he had previously told Ricardo Lee not to come in his home, he found him there, asked him not to come back and that he was not welcome. The next day when he heard a commotion Petitioner came upstairs with a gun. He saw Ricardo with a knife in his hand and he told him to leave. Petitioner stated Ricardo Lee came toward him and made a gesture. His first intention was to shoot and just make him stop. Then he fired 10 times. Petitioner stated when he came upstairs Ricardo Lee was inside the front door. Other people in the house were Trusby Hubbard, David Pleasants, Jim Taylor, and Mark Heaton.

Trusby Hubbard told him that he was at Andre Fraziers house that is right next door along with David Pleasants, Ricardo Lee and Mark Heaton. David Pleasants told him that he and Ricardo Lee went there to buy crack. It appears that Mr. Frazier had a "crack house." The State Medical Examiner found no crack cocaine in Ricardo Lee's system. Trusby stated that when they got to his house he and David Pleasants went inside and Ricardo Lee followed them to the door. Trusby told Ricardo Lee that he was not supposed to be there and attempted to close the door and closed it on Ricardo Lee's hand. Then Lee kicked or shoved the door open and entered the house. Mr. Hubbard came up the stairs and Trusby went to his attic bedroom. Therefore, he did not see the shooting. Mr. Jim Taylor did, in fact, see the shooting. He was coming out of a bathroom and heard Ricardo Lee yelling and then the next thing he knew Petitioner was shooting

10

A 1201

at him. Lieutenant Helton found a kitchen lying near Ricardo Lee. There was no evidence that it was part of a matched set of knives belonging to the Hubbards, but there was a wide variety of kitchen knives in Mr. Hubbard's kitchen. It appears that at some time Officer Brooks took possession of the knife and firearm.

The State then asked that the gun be admitted into evidence and there was no objection. The State then asked that the knife be marked as exhibit 2. Officer Helton identified the knife as the one he saw at the scene. He said he visually examined the knife for fingerprints and stated that there were none on it, but it was still sent to the State Police Laboratory.

He testified that he spoke to Pat Adams and Ethel Adams when they came to the police department and stated that they had some information they needed to share with him. The related that they talked with Petitioner on the day before the shooting and he told them he was tired of the mess and that he would kill himself a niger(sp) son-of-a-bitch.

Neither Petitioner or Trusby Hubbard told the witness that there had ever been any violence between he and Ricardo Lee. He simply did not want Lee around his house because the day before Ricardo stole two baseball caps from the Hubbard house.

Ms. French conducted a cross examination beginning with Petitioner telling Ricardo Lee that he did not want him around his house. She established that Petitioner told Ricardo Lee many times that he did not want him around his house. She established the fact that Petitioner was in his basement and heard "all hell break loose." He stated he heard a calamity, his son screaming, and then screaming for the Petitioner to come upstairs.

She asked David Pleasants about a knife and he said he never saw that knife. He testified that Andre Frazier told him that Ricardo Lee tried to sell him two knives on the day of the shooting. Frazier also told him that the knife fit the description of that knife marked as exhibit 2. Frazier had asked Ricardo Lee and David Pleasants to leave because he saw smoke coming out of his apartment and Lieutenant Helton agreed that it was probably "crack smoke". Ms. French then asked if Petitioner appeared to be intoxicated or under the influence of drugs and the officer said no. On redirect the State asked the Officer if he spoke with David Pleasants and he said Pleasants said he saw nothing. He further asked him if Ricardo Lee had a knife earlier that day and Mr. Pleasants said that he did have a knife.

11

AL1202

On re-cross examination Ms. French asked when Petitioner had the conversation with the Adams and he testified that it was the day before the shooting. When Adams was questioned about his grand jury testimony concerning the date, he said it was inaccurate.

He stated that Ethel and Pat Adams came to see him and there was nobody with them at the time nor when Petitioner was alleged to have made the statement.

38. The State then called Patrolman Sam Whitt as its next witness. At this point in time Ms. French asked to approach the bench and told the Judge that on the previous day Mr. Sitler told her that Patrolman Sam Whitt told him that when they came upon the scene he talked with Trusby Hubbard. Trusby told him he popped a shot in his ass meaning Ricardo Lee. Since it never came out in the investigation, she requested that the Judge not permit Sam Whitt to mention this fact in his testimony. The Judge agreed to do as she requested.

39. Corporal Sam Whitt was employed by the Bluefield City Police Department on July 4, 2005. He was a first responder to the shooting at 120 Poplar Street in Bluefield, WV. Upon arrival he found Petitioner and his son, Trusby on the back porch of the home. He found Ricardo Lee just inside the front door. He was against the front door. He was bleeding and kept saying "Whitt, it hurts." There was a small knife lying right next to his body at his waist. It looked like the knife identified as Exhibit 2. The was no evidence of a struggle and there appeared to be no marks on Dennis or Trusby Hubbard.

He found Ricardo Lee against the front door and there was no blood trail as if he had been dragged back against the door. When he and Officer Brooks arrived, they had to force their way inside the home because the body of Ricardo Lee was blocking the door. Mr. Hubbard came in and was telling him what had happened. He identified a spot on a diagram where Petitioner said he was standing when he shot Ricardo Lee. He then made sure there was no other person in the house and he locked the door and followed the ambulance to the hospital. He encountered the wife of Petitioner at the hospital. She was an employee in housekeeping and was cleaning up the clothes, rags and other items. When she learned that the shooting took place at her home, she became upset and he assumed that she left. He had called Lieutenant Helton for instructions before he left the house and he was advised to lock the door and leave.

40. Ms. French established that Corporal Whitt was sitting in his car talking with Dennis and

12

A 1203

Trusby Hubbard who were standing outside on the back porch. It appears that when he went to the front door he had Officer Brooks with him. When he tried to open the front door he saw Ricardo Lee's legs against the door.

41. On re-direct examination Mr. Sitler had Corporal Whitt draw the body on a diagram. He explained he had to move the body of Ricardo Lee and step over him to get into the house. He said the back of his legs were against the door. Officer Whitt said Mr. Hubbard was 12 to 14 feet from the body when he fired the shots.

42. At the end of the witness testimony the parties and Court discussed jury instructions. The conduct of defense counsel seemed reasonable and she saw to it that a self defense instruction and defense of person and home was included. She agreed to some instructions and objected to others. The verdict form was left for a later argument. The state asked for 20 minutes argument time and Ms. French asked for, and got, 30 minutes. At this point the Court properly advised Petitioner of his Newman Rights and spent a great deal of time going over them. When the Court inquired as to the number of witnesses the defense would call she stated that some of the Prosecutor's witnesses were her witnesses and in addition to those witnesses she had at least 5. The Court then recessed until 9:53 a.m. (Tr. 199-214).

43. When the trial resumed on August 30, 2006, Ms. French brought to the Court's attention that one Sergeant Myers had obtained some statements from the State's witnesses and these statements were not provided to her. Those witnesses were Mark Helton, Dana Milam, Pat Adams and Ethel Adams. It appears Ms. French had requested statements from witnesses and these had not been provided.

The Court seemed to think she could not get them until after each witness testified, but Ms. French was of the opinion that she should get them earlier.

The State was of the opinion that Ms. French received a discovery packet prepared by Lieutenant Helton and he retired. Sergeant Myers who took over the case after Lt. Helton's retirement, had obtained these statements.

The State said that Ms. French had statements taken by an investigator from the Public Defender's Office prior to Sergeant Myers taking the statements. The statements in issue were consistent with the narrative that was in Detective Helton's report. The Court established that the

13

A1204

State had statements that were not given to Ms. French.

At Ms. French's insistence, the Court required the State to immediately turn over copies of all statements and after each one of the witnesses testified he would recess until Ms. French was ready to proceed. Ms. French said that Sergeant Myers told her about the conversation with Mark Heaton, but she was not able to get a statement from Mark Heaton. Then, the Judge permitted Ms. French to interview Mark Heaton "...all you want.." before he testified . (Tr. Vol.11, 4-9).

44. **Patrolman Jason Brooks**. Officer Brooks testified that he was employed by the Bluefield, WV Police Department on July 14, 2005, and was the second officer on the scene at the shooting at 120 Poplar Street in the City. Officer Whitt had been there for a brief period of time and they spoke with Petitioner first who told him he came upstairs and saw Ricardo Lee on his porch. Lee had a knife and refused to leave the residence after being requested to leave. Petitioner said he shut the door and Ricardo Lee kicked in the door into the residence and that was when he shot him. He stated that he fired the gun 10 times. He indicated on a diagram where Petitioner said he was standing when he fired the shots.

He was present when Patrolman Whitt opened the door to the residence and the body of Ricardo Lee was **NOT** against the door. He opened it about a foot and that is where is struck the body of Ricardo Lee. It was still close enough that you could not open the door.

Petitioner had no physical injuries.

He talked with Trusby Hubbard and he said that he and a friend were on the porch getting ready to go into the house. They asked Ricardo Lee to leave and he did not. Trusby and his friend went inside and Ricardo Lee pushed his way into the house. He said his dad (Petitioner) had come upstairs and told him to leave and then shot Ricardo Lee. At this point both father and son had stated that they had closed the door on Ricardo Lee. The witness did not remember, for sure, whether there was anyone else present. However, he did testify that the room description on the floor was accurate.

Ms. French, when she began cross examination of Patrolman Brooks, explained the marking of the room on the floor and compared it to the diagram. She established that all the statements he testified to were statements that he personally obtained on the scene. Again she

14

A1205

used the diagram and floor markings to establish where the knife was laying. He also described the knife. The gun was on a piano. Petitioner was scared, nervous and excited. The witness said that he had been to the house before, but did not know the reason. He had talked with Petitioner about the gun he had on his side and the officer said there was nothing wrong with that. He further testified that he had responded to a large number of calls from that neighborhood. (Vol. II Tr. 13-33).

45. At that time the Court ruled that since the names of the witnesses were given to Ms. French during discover, the State did not have to produce the actual written statement until after the witness had testified. He then enforced Rule 26.2 and allowed Ms. French to take a break after the witnesses testified. (Vol. II Tr. 36).

46. **Trusby Hubbard.** The State then called Trusby Hubbard, the son of the Petitioner, to testify. He stated he was present at his home on 120 Poplar Street, Bluefield, WV and the 14th day of July 2005. But, he was not in the room when the shots were fired. He said everybody always went next door to smoke crack, weed, etc. Ricardo Lee was just a normal street person and he happened to be there. Ricardo Lee had been to his house several times previously, but not that day.

He testified that on the day before, July 13, 2005, Ricardo Lee had walked into the house and gone into the bathroom where his mother was taking a bath. Petitioner told him to leave and never come back. He left. Petitioner gave him this warning in Trusby's bedroom.

At the time of the actual shooting Trusby and David Pleasants were in Trusby's attic bedroom. When the shooting occurred Mark Heaton was passed out on the couch. Jim Taylor was there as well but he was bad on crack and shooting pills. Dennis Hubbard, Jimmy Taylor, Mark Heaton and Ricardo Lee were in the living room. Trusby Hubbard and David Pleasants were in Trusby Hubbard's attic bedroom.

David Pleasants and Ricardo Lee were at the house, which was Antonio Fraziers, next door smoking crack and the owner had thrown them out. Trusby was talking to David Pleasants and told him just to come on up to the house. They went in the house and he turned to close the door when Ricardo Lee put his foot in the frame so it could not be closed. He saw something in Ricardo Lee's hand and then Lee kicked the door causing Trusby to fall on the floor. He heard

15

his father near the top of the steps and he went on up to his attic bedroom. The next thing he knew, Jimmy Taylor ran up the steps and told them Petitioner had shot Ricardo Lee. He described Ricardo Lee as being 200 pounds and real tall. Trusby said he was tired, intoxicated and thought his father could better deal with the situation since the house belonged to his mother and father. Trusby had known Ricardo Lee about two or three months and Lee had been to his house two or three times.

On the day before the shooting Ricardo Lee just walked into the house, went in the bathroom on Mrs. Hubbard and walked up to Trusby's room. Trusby was there with Mark Heaton and Ricardo Lee was uninvited.. Petitioner came up to the bedroom and told him to leave and never come back. As he left Lee stole two baseball caps.

After the shooting he asked his father why he shot him and he said, "He had a weapon in his hand". He also said he saw Officer Brooks remove a knife from the hand of Ricardo Lee.

He said that Jimmy Taylor was staying with them at the time and that he was on the couch passed out. He woke Taylor up and told him to go call the police as they did not have phone service in the home. After the shooting nobody moved the body. Ricardo Lee may have moved a little, but nobody moved the body. Mark Heaton had to step over it to go and use the phone.

On cross-examination Ms. French established that Trusby was 5'4" tall and weighed 125 pounds. She further inquired into the layout, furniture, the way the door opened, the way Ricardo Lee opened the door, the fact that the door had to be opened 4 or 5 inches so that Mark Heaton could step over Ricardo Lee to get out to call the police and that when they opened the door Ricardo Lee's foot fell out. (Vol. ll Tr. 67-70).

47. **Mark Heaton.** Mr. Heaton testified that he resided at 1210 Highland Avenue Bluefield, WV which is 4 or 5 houses from the Hubbard residence. He was in the Hubbard living room with the air conditioner and TV playing and he was pretty much passed out. He had consumed 5 quarts of beer. Other than that, he said he did not remember much. He did remember Trusby Hubbard waking him up, seeing Ricardo Lee on the floor, stepping over him and going out to call 911. He did not see or look for a knife and was not worried about a knife.

Ms. French then took a break to review the written statement the Judge ruled on earlier.

16

AI207

She began cross-examination by asking the witness if he had a prior altercation with Ricardo Lee. He stated that Ricardo Lee would come through their house after forcing his way inside. "Actually it was just plain burglary". Once inside he would not leave and it had been necessary to call the police. Mr. Heaton had Ricardo Lee put in jail on a previous occasion. After he was released from jail he came back to the Heaton home and threatened to beat up Mr. Heaton because he had him arrested. There were five or six other occasions where the two had physical altercations because Ricardo Lee would not leave Mr. Heaton's house.

On redirect the state established the fights were over beer, wine, girlfriends and the fact that he would not leave. Lee had never pulled a knife on Mr. Heaton and Mr. Heaton had never seen him with a kitchen knife.

On recross Ms. French established that Ricardo Lee was a nuisance who wanted to stay at your house and drink all of your beer. In Mr. Heaton's opinion Mr. Lee was an obnoxious and kind of aggressive person. (Vol. II Tr. 71-88.

48. **David Pleasants (Spanky).** His testimony was somewhat inconsistent. In essence he said that the day of the shooting is the first time he met Ricardo Lee. He went to his friend Wally's house and saw them sitting on the porch talking and drinking. He stayed and had a few beers and when it was all gone, he decided to go get a lawnmower to sell. As he was pushing the mower down the street Ricardo Lee said he would walk with him. He said he immediately went to Trusby's house and Ricardo Lee went to Antonio Frazier's apartment. Someone came in and was talking to Ricardo Lee and he went back to Trusby's house. He remembered Ricardo Lee coming to the house and pushing the door in on Trusby. He said there was some bad blood between Ricardo Lee and Trusby. He said Trusby told him to leave, he pushed the door in and was standing in front of the door, inside the house. He did not see, nor did Trusby tell him that Ricardo Lee knocked him down. He did agree that the diagram of the room on the Courthouse floor was accurate. He and Trusby went to Trusby's bedroom and he heard Dennis Hubbard tell Ricardo Lee 10 times to leave and get out of his house. He did not see anything in Ricardo Lee's hands. He did not see him wave a knife at anyone. After hearing shots he came downstairs and saw Ricardo lying against the door with his head in the direction of coming into the room. He agreed with the diagram marked by Sergeant Whitt. While they were in the bedroom, Jim Taylor

41208

came upstairs and told Trusby that his dad just killed somebody. He ran down the steps and saw Ricardo Lee on the floor moaning and he ran out the back door. He wasn't looking to see if Ricardo Lee had a knife.

On cross-examination Ms. French elicited testimony that before they went to Andre's Ricardo Lee was intoxicated and was so-so staggering, tipsy. He asked him where he could find some crack. When David Pleasants saw the body, he ran out the back door. He heard Petitioner ask Ricardo Lee to leave calmly and the conversation between Petitioner and Ricardo Lee got louder. He was positive that he saw Ricardo Lee push the door in and Trusby stagger, but he did not fall. Trusby had told Lee to get off the porch, leave the house, Petitioner told Lee to leave the house, but he chose to stay. (Tr. Vol. II 95-115).

50. **Pat Adams.** Mr. Adams began his testimony by saying "I'm hard of hearing". Then he said he lived on Highland Street near 120 Poplar Street, Bluefield, WV. Two days before the shooting Petitioner seemed upset. Much of the testimony was unintelligible until he said "I'm going to kill the SOB nigger". The State's attorney said, " He said I'm going to kill the son of a bitching nigger, or nigger son of a bitch or something like that?" The witness said, "Right. At this point there was a lunch recess and after the lunch break they took the testimony of the Medical Examiner. Mr. Palmer conducted the cross-examination of Mr. Adams. When asked where in McDowell County he lived he responded, " I can't hear you too good." After Mr. Palmer repeated the question, he said "Around Welch". When asked how long he knew Petitioner, he said he didn't know him, but off and on they would see one another. He testified that he never knew Petitioner to cause trouble in the community.

He remembered that in June of 2006 he gave a statement to a police officer. He somewhat testified that there was trouble at the Petitioner's house, but Petitioner did not cause them. They were caused by his son, Trusby. He was obviously having a great deal of trouble hearing Mr. Palmer.

With regard to Ricardo Lee, he had to stop letting him work for him because Lee liked to drink beer on the job. He said Lee stole from him, but he could not prove it in a Courtroom. In his next answer he said "Yeah, he didn't steal nothing off of me." Soon the Court, on its own, decided to allow Mr Palmer to ask leading questions. The Judge also permitted the witness to

18

A1209

stand in front of the jury box.

The witness said that a lady came to his house and told him about the reward. After he saw it on TV he and his wife went to the court. Mr. Palmer got him to deny there was a reward poster on the light post in front of his home. When pressed about Petitioner saying he was going to kill him a son of a bitch nigger, he said he told his daughter, " He got him one". Given all of the circumstances, it appears that Mr. Palmer did as well as anyone could with regard to cross-examination of this particular witness.

Then the State conducted redirect testimony and the witness stated that they reported it at the time it happened. It appears that was when it happened to be on TV. (Vol. ll Tr. 177).

At that time a radio interview was played for the jury and the Court adjourned for the day. However, before that the testimony of Dr. Hamada Mahmoud was put before the jury.

51. **Dr. Hamada Mahmoud.** This witness was the Chief Medical Officer of the State of West Virginia, and has had that position since 2002. He held a similar position in Pittsburgh, PA for nearly 23 years. In his career he had performed over 4,000 autopsies, because it was his responsibility to determine the cause of death for crime victims. He performed the autopsy on Ricardo Lee and prepared the autopsy examination report which was marked as State's Exhibit No. 3. The autopsy was performed on July 15, 2005. The cause of death was multiple gunshot wounds into the trunk and extremities. There was a total of 10 gunshots. ( Vol. ll Tr. 132).

At a pre-trial hearing Ms. French requested that the face be covered and at that time she wanted the head removed from the photo and that was done.(Vol. ll Tr. 134). The photos had also been converted to black and white to make them more discreet.

At this time all of the wounds were marked on a demonstrative exhibit and there was no opinion of the order in which they were fired. It was his opinion that Ricardo Lee was shot 10 times and there was no evidence they were contact or close range shots.

When asked if a toxicology was done and if there were cocaine metabolites he said there was no cocaine , only alcohol in the amount of 0.17 which is twice the legal limit. He further testified that the soles of Ricardo Lee's shoes did not have blood residue. This fact indicates that he did not walk far or did not walk at all.

Ms. French began her cross-examination by establishing that she had talked to the witness

19

before on the telephone. She established that it is consistent that the shots were fired quickly but he would not agree that the bodies were moving. However, she did get him to say that most gunshots are not fatal and the person can still move unless shot in the heart or head and that was not the case in this situation. She did re-establish the fact that Ricardo Lee was 6'2" tall, which made him a much larger man than the Petitioner. (Vol VII Tr. 129-152). The State played a radio tape for the jury and announced to the Court it rested.

52. Jimmy Ray Taylor. The defense opened with the testimony of Jimmy Ray Taylor, who was living in the Hubbard house on July 14, 2005. He had been there when Petitioner had problems with Ricardo Lee coming into the house and he usually had to make Lee leave. On the day in question he arrived home about 30 minutes prior to Ricardo Lee and proceeded to the basement to talk with Petitioner. Petitioner was working on a garden tiller and had his gun on his side. This was normal because they lived right beside a crack house.

While they were in the basement they heard a crashing noise through the grate in the floor. Petitioner went upstairs and Mr. Taylor followed. Trusby yelled for Petitioner to come up and help him. He understood the diagram of the house which was on the floor of the Courtroom.

When he came upstairs he saw Ricardo Lee with a knife and told him the best thing he could do is leave. Ms. French went into great detail with this witness with regard to the diagram and where the parties were standing. Petitioner told him to leave as well and his weapon was still in his holster. Ricardo Lee said, "I'm not going no Goddamn where. I'm talking to my friends". Ricardo Lee did not leave and he was "coming on in". Dennis pulled gun and started firing and the witness saw all of the shots. He then ran upstairs to get Trusby.

When he went upstairs he told Trusby that Petitioner had shot Lee. He, Trusby and David Pleasants ran down stairs. Trusby ran to the livingroom and was trying to awaken Mark Heaton. David Pleasants took a look and ran out the back door. Trusby got Heaton awake and told him to go call the law. Ricardo Lee was partially blocking the door and Mark Heaton had to squeeze through the doorway. At that point the witness said he left through the back door. That concluded his direct testimony.

The State attempted to discredit the witness by differences in the immediate testimony and the statement the witness gave Lieutenant Helton. The questioning related to whether or not

20

A1211

Petitioner was working on a weedeaters or tiller in the basement and whether or not he came out of the bathroom or came directly up the steps. He then said "I just told him he needed to leave and that's when I saw the knife." He told him to leave because he was trouble and he had been told to leave before. He had come to visit Trusby quite a few times. He testified that Trusby, David Pleasants and Ricardo Lee smoked crack cocaine. As a result of the State's questioning he now said he did not see a knife in the beginning but he saw it when Ricardo Lee was on the floor. The witness stated that he did not remember telling some things to Lieutenant Helton. When asked about Ricardo Lee's reaction to all of the shots, he said he thought he had blanks. (Vol. ll Tr. 5-41).

53. **Dennis Gale Hubbard.** Mr. Palmer then called the Petitioner (Defendant) to testify on his own behalf. He was a life-long resident of Mercer County, West Virginia, married for 30 years, had two sons and two grandchildren. Presently, he was an over-the-road truck driver waiting to be called by FBE out of Dallas, Texas, and had a current valid commercial driver's license. Up until that time he had no road law violations or had ever been convicted of a felony.

With regard to his son, Trusby, he is an alcoholic and they were trying to get him straightened out. He did not want his son associating with Ricardo Lee and he would run him off when he came around.

Ricardo Lee had a bad reputation in the community. He would break into people's homes, steal and carry away property and barge into homes to see what he could get. Trusby's friends were often a conflict between Trusby and his Father. Trusby was the only person in the home who used drugs.

He first met Ricardo Lee when Lee just walked by the house and stopped to talk with him. It was a casual meeting and he smelled alcohol on Ricardo Lee. At another time Lee stopped by and told him that he had been next door to a local crack den attempting to buy crack cocaine. Lee asked him about buying crack and he told Lee he did not use it and he should go away from his house and not come back. After this, every time he came around the Petitioner would run him away.

There was a serious encounter on July 13, 2005, the day before the shooting. Petitioner was working in his garden and Ricardo Lee came up the alley and stopped to talk. Petitioner told

21

him that he had repeatedly caught him barging into his house and he did not want him there any more. Petitioner told Lee he did not like what he was doing and he did not want him in his home. Petitioner thought he left, but when he looked around he saw Lee going into his house. He went to the house and started looking for Lee. He found him in the attic with Trusby, Mark Heaton, Jimmy Taylor and someone named Justin. Lee had also walked in the bathroom when Petitioner's wife was taking a bath that same day.

He then told Lee to leave the house and he refused. Petitioner went across the street and called the police. The police did not appear. During that period of time, Ricardo Lee left.

Petitioner related to the jury that Mark Heaton had Ricardo Lee arrested and after he was released he came to Mark Heaton and told him, "You have me arrested again, I'll beat the hell out of you". Then Petitioner spoke up and said he would have him arrested. He testified that he did not have it in for Ricardo Lee, but did not want him around his house.

On July 14, 2005, in the evening, Petitioner was in his basement working on a garden tiller and he had a weedeaters that he was soaking in cylinder penetrating oil. Between the hours of 6:30 p. m. and 8:30 p.m. Trusby came home, then Mr. Taylor came in, as did Mr. Pleasants. He heard a lot of noise and started up the stairs. He heard Trusby call to him to come upstairs. He heard Trusby tell Ricardo Lee to get away from the crib and get off the porch. Then he heard a great deal of noise and he had his weapon in his holster. He carried it because he lived in crack alley, which was a bad neighborhood. Mr. Taylor and he were going up the stairs and he heard Trusby tell him he was going to have to take care of the problem. He said he came upstairs and came to stand by the piano. It appears they were using the diagram on the floor to indicate the area. He said Ricardo Lee advanced 2 feet inside the door. He then told him to leave, but he had a knife in his hand. I told him again to go away and he ignored me. I again told him to get out of my house. Lee acted like he wanted to step forward. I was scared of him and I did not know what he was thinking. Petitioner paused and stepped backwards one step and started firing. Petitioner was pretty sure Officer Brooks took the knife out of Mr. Lee's hand.

He said he gave a statement to the police at headquarters. When he asked the police about his home, they told me to clean it up, because they were through.

On cross-examination Petitioner stated that himself, Trusby, David Pleasants, Mark

22

Heaton and Mr. Taylor were in the house when he shot Ricardo Lee. Petitioner had drawn a diagram of the room for the police and the State was using it for cross-examination purposes. He stated there was a lot of confusion at his house that night.

Petitioner told the radio reporter that Ricardo Lee was "whacked out on crack cocaine." Petitioner testified that two eyewitnesses said he was smoking crack just prior to entering his home. One of the witnesses was Antonio Frazier and Petitioners answered "We don't know where he's at." He also said David Pleasants (Spanky) was down there with Lee trying to buy crack. However, Spanky did not see Lee smoking crack.

The witness testified that he wanted to keep Ricardo Lee away because he admitted to crack usage and he stole two baseball hats from Petitioner's home. At that time there were several people who used drugs in the home. Apparently the only two people in and around the home who did not use alcohol and drugs were Petitioner and his wife.

Petitioner testified that when he told Ricardo Lee to get out of his house, Lee stated making motions with the knife. These movements prompted him to unholster the pistol and made it visible, not pointing. He again told Lee to leave and he refused. Lee became belligerent, aggressive and took a step forward. That was when he said he shot him in the leg. Petitioner used the floor diagram to show distances and his location during the shooting. He was still standing until the 10th shot was fired.

He had no recollection of making any statement to the Adams family with regard to shooting anyone and said they were busybodies and troublemakers. When he was confronted by the fact that Officer Brooks testified he did not remove the knife from Ricardo Lee's hand. He stated both Brooks and Whitt were lying. When asked why he shot Ricardo Lee? Petitioner answered, "I feared for my life and I defended myself."

The defense rested and the state had no rebuttal evidence. At this point in time, defense counsel did not propose a Motion for Judgement of Acquittal on any of the charges. It is obvious that it was a self defense case and should have been submitted to the jury for a verdict.

54. Prior to reading the instructions, the Court asked, "So does counsel want the instructions recorded? And both answered, "No". The Court proceeded to read the instructions and advised the jury that a copy of all would be sent to the room with them.

23

55. **Instructions.** The Court read a general charge to the jury which contained the following specific instructions.

A. Competency of defendant as a witness.

B. Murder in the First Degree, Murder in the Second Degree, Voluntary Manslaughter and not guilty.

C. Premeditation.

D. Definition of deliberate and premeditation.

E. Definition of Malice.

F. Inference of Malice and Intent.

G. Definition of deadly weapon.

H. Two theories of self defense. They are self-defense of one's person and self-defense of ones home.

I. The State v. Golf Instruction.

J. A one and one-half page instruction on the law of self-defense in West Virginia.

K. The last instruction was based upon defense of one's home and read, " A person in his own home who is subject to an unlawful intrusion and placed in immediate danger of serious bodily harm or death has no duty to retreat but may remain in place and employ deadly force to defend himself.

The reasonableness of the occupant's belief and actions in using deadly force must be judged in the light of the circumstances in which he acted at the time and is not measured by subsequently facts." Based upon the subsequent verdict, the jury did not believe it was an unlawful intrusion, that Ricardo Lee did not place Petitioner in immediate danger of serious bodily harm or death, they perhaps believed that Petitioner used excessive and deadly force in a situation that was just not that threatening. These instructions were sent to the jury room by the Court for their information. ( Vol. III, Tr. 1/14).

56. **Closing Arguments.** The State split its argument and took the position that this was a case about needless killing and wasted human lives and wondered why it all revolved around the Hubbard home. He said the specter of crack cocaine hung over the case and the defendant intended to lay that specter at the feet of Ricardo Lee. The defense tried to make Mr. Lee the

24

A.1215

unwelcome visitor bringing the poison into the Hubbard home and into their lives. In fact Ricardo Lee had no drugs in his system at all and he was only drunk at the time. Counsel commented on the absence of Antonio Frazier and Ms. French asked to approach the bench to object and the judge then instructed the jury to disregard the comment and that the Defendant had no burden to do anything or produce anything and those comments were not to be held against the Petitioner.

Counsel for the State related that Officer Sam Whitt arrived on the scene and found Ricardo Lee lying against the door with a knife near him. He further said there was no evidence of a struggle in the home, no trail of blood back to the door, injuries were serious and he said "It hurts, Whitt."

He commented on the discrepancy with regard to where Petitioner was located when Ricardo Lee arrived, who opened the door, the knife in the hand of Ricardo Lee, the occupants of the living room at the time of the shooting, the location of Jim Bob Taylor.

Dr. Mahmoud testified that he had done more that 4,000 autopsies and that each mark on Ricardo Lee came from a different bullet and that each shot was a separate continuous to take the life of another. He said firing 10 rounds was beyond self defense. He commented on the unacceptable friends Trusby brought to the home. (Vol.III Tr. 115-126).

Ms. French began with a detailed account of the shooting beginning with Ricardo Lee Breaking in the door. She said Petitioner came up the stairs to find Ricardo Lee drunk, belligerent with alcohol induced adrenaline coursing through his blood standing there in a threatening manner with a knife. Petitioner then began asking Ricardo Lee to get out of his home. He even says "I'm not going no Goddamn anywhere until I see my friend." Mr. Taylor saw Lee move toward Dennis and thought he was going to do something to Dennis.

She described the physical difference between Petitioner and Ricardo Lee and surmised Lee was trying to get upstairs. Trusby or Spanky had crack and Ricardo Lee was going through Petitioner to get some. Dennis opened fire initially to get Lee to stop, but he would not and then Petitioner fired the weapon until it was empty.

She said when the Police came Petitioner saw Officer Brooks reach down and pick up the knife and thought it came out of Ricardo Lee's hand.

A 1216

She went on to address Mr. Adams and his inability to hear or communicate. She wondered how he could hear on a busy city street. She stated her client denied the conversation.

Ms. French then spent the remainder of her time on self defense and the right not only to protect yourself, but to do so within your own home and further advised the jury that Petitioner was not guilty of any criminal conduct. (Vol. III Tr. 127-133).

The State then made the second part of its closing argument. He responded to the allegations of Ms. French by saying that if Mr. Lee was such a junkie and hell bent on destruction, one would think he would move beyond the door and have a little cocaine in his system.

He characterized the situation as "...this continuous boozy, drug, crack party at 120 Poplar Street...." and referred to it as dope central. (Vol. III Tr. 133-135).

57. **Verdict.** The Jury returned a verdict of guilty of second degree murder on September 1, 2006. A motion for a new trial was filed on September 19, 2006 and subsequently denied.

58. **Sentencing.** By order entered October 31, 2006, Petitioner was sentenced to forty (40) years in the custody of the West Virginia Department of Corrections. Defendant's appeal was refused by the West Virginia Supreme Court of Appeals on September 25, 2008 on a 5-0 vote.

59. After being convicted, and while serving his sentence, Petitioner has filed numerous civil actions in the Circuit Court of Mercer County, West Virginia. Those are as follows: 09-C-78 Habeas Corpus;10-C-497, Petition for Writ of Mandamus; 11-C-281, Hubbard v. Aboulhosn; 11-C-282, Hubbard v. Swope; 11-C-283, Hubbard v. Ash, et al.; 11-C-284, Hubbard v. WVDOC, et al.;11-C-285, Hubbard v. Adventure Radio; 11-C-286, Hubbard v. DHHR; 11-C-287,Hubbard v. City of Bluefield; 11-C-288, Hubbard v. Bluefield Rescue Squad; 11-C-321, Hubbard v. Bird; 11-C-326, Hubbard v. Houdyschell; 11-C-411, Hubbard v. Sadler, et al., 11-C-476, Hubbard v. Public Defenders Corp. et al.; 11-C-477 v. Public Defenders Corp. et al., and 12-C-320 which is the instant case.

60. State of West Virginia, ex rel. Dennis Gale Hubbard, v. David Ballard, Warden, Mount Olive Corrections Complex, Civil Action No. 09-C-78, was denied by Order entered on the 17th day of May, 2010, by Honorable Omar Aboulhosn.

On December 15th, 2010 a status conference was held in the Circuit Court of Mercer

County, West Virginia, concerning Petitioner's appeal of Court Orders entered May 17, 2010 and October 18, 2010 wherein Petitioner's Revised Petition for Writ of Habeas Corpus and a pro se Petition for Writ of Habeas Corpus were denied. The Court noted that Petitioner's counsel failed to make a timely appeal. The trial court found that the May 17, 2010 Order in Civil Action No. 09-C-78 was to be re-entered to permit the Petitioner the reasonable time necessary in order to perfect his appeal as demanded the interests of justice in this case. The Court stated, "It is the further ORDER and DECREE of this Court that pertaining to Civil Action No. 09-C-78-OA, the appeal time begins from the date of entry of this ORDER". The entry date was December 16, 2010 as stamped by the Mercer County Circuit Clerk.

On January 18, 2011, a Notice of Appeal Form was filed in the West Virginia Supreme Court of Appeals by stamp of Rory L. Perry, II, Clerk. The form was prepared by Michael P. Cooke, counsel for Petitioner, and his certificate of service indicates that it was mailed on January 14, 2011. Petitioner's brief was stamped by said Clerk's Office on January 27, 2011. On June 21, 2011, The West Virginia Supreme Court of Appeals, in Hubbard, v. Ballard, Warden, No. 11-0125, dismissed the case for failure to timely perfect the appeal.

61. On June 7, 2012, Petitioner filed Habeas Corpus No. 12-C-320. The first page states, "THIS PETITION DEALS EXCLUSIVELY WITH, AND RAISES ONLY, THE GROUND OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PETITIONER'S OMNIBUS HABEAS HEARING IN MERCER COUNTY CIRCUIT IN CIVIL ACTION 09-C-78-OA."

62. At this point it is necessary to point out that Petitioner set forth in his prior Habeas Corpus, 09-C-78, that his trial counsel were ineffective in that they:

    a. Failed to adequately prepare for trial;

    b. Failed to motion the trial court for a change of venue;

    c. Failed to motion the trial court for an Order allowing the Petitioner to undergo a competency evaluation.

    d. Failed to protect the Petitioner's interests in having a fair trial when a continuance was not granted upon the inability to locate a witness.

    e. Failed to gain an acquittal based upon the affirmative defense of self defense at his conviction was based upon insufficient evidence.

The Judge proceeded to determine that Petitioner had no valid claim of ineffective assistance of counsel during the underlying trial.

63. In the principal case Petitioner alleges that his lawyer in the former Petition for Writ of Habeas Corpus failed to provide effective assistance of counsel for the following reasons.

a. Michael P. Cooke failed to develop certain facts and raise certain issues by failing to object to the prosecutor's remarks in opening statements that were false and misleading.

b. Michael P. Cooke failed to develop facts that trial counsel failed to call Stephen C. King of the West Virginia State Police Forensic Laboratory to testify to the results of fingerprint testing.

c. Michael P. Cooke failed to develop facts that trial counsel failed to object to individuals testifying to the results of toxicology when they had not performed the studies.

d. Michael P. Cooke failed to develop facts that trial counsel failed to move for a mistrial after the testimony of Officer Sam Whitt when he failed to corroborate a critical statement made by the prosecutor in his opening statement.

e. Michael P. Cooke failed to develop facts that trial counsel failed to cross-examine Dr. Hamada Mamoud, the State's medical examiner, as to what effect the blood transfusions allegedly given the victim, may have had on the results of the toxicology test.

f. Michael P. Cooke failed to develop facts that trial counsel failed to subpoena the actual person who performed the toxicology tests so that he could be challenged with regards to the results.

g. Michael P. Cooke failed to develop facts that trial counsel failed to call witnesses to attack the credibility of one Pat Adams who testified that Petitioner told him that he was going to kill the victim.

h. Michael P. Cooke failed to develop facts that trial counsel failed to call witnesses who would have testified that the victim had previously broken into the witness' house and had to be forcibly removed.

I. Michael P. Cooke failed to develop facts that trial counsel failed to move for a mistrial because the prosecuting attorney implied that the Petitioner had a burden to call a states witness and the witness failed to appear because he had no truthful testimony to offer.

28

A.1219

j. Michael P. Cooke failed to develop facts that trial counsel failed to adequately cross-examine Detective Tom Helton with regard to the fact that the only set of fingerprints submitted with the knife were those of the Petitioner.

k. Michael P. Cooke failed to develop the fact that trial counsel failed to move the court to quash the indictment because Detective Tom Helton gave false and misleading testimony to the grand jury.

l. Michael P. Cooke failed to develop the fact that trial counsel failed to recall Officer Sam Whitt and cross examine him as to the positioning of decedent's body after Officer James Brooks' testimony was contradictory.

m. Michael P. Cooke failed to develop the fact that trial counsel failed to adequately cross examine the medical examiner as to the effect alcohol and/or crack cocaine had on the decedent's ability to stay on his feet after he had been shot.

n. Michael P. Cooke failed to develop the fact that trial counsel failed to present evidence that bullet patterns on the wall that the victim was advancing upon Petitioner and continued to do so after he was shot several times.

o. Michael P. Cooke failed to develop the fact that trial counsel failed to call as a witness Kenny Coy to testify that the victim sold him a bicycle that had been stolen from Petitioner's front yard.

p. Michael P. Cooke failed to develop the fact that trial counsel failed to call rescue squad witnesses to rebut Officer Whitt's testimony as to the positioning of the body.

q. Michael P. Cooke failed to develop the fact that trial counsel failed to impeach Officer Whitt on the distance of the body to Petitioner at the time of the shooting.

r. Michael P. Cooke failed to develop the fact that trial counsel failed to object to members of the jury being state and county employees.

s. Michael P. Cooke failed to develop the fact that trial counsel failed to object to the Prosecutor identifying the murder weapon as a .9mm instead of a .380.

t. Michael P. Cooke failed to develop facts that the trial counsel failed to subpoena Virgie Hubbard to testify that the victim walked in the bathroom on her prior to the shooting and Trusby Hubbard to testify that he caught the victim spying on Virgie Hubbard as she bathed.

29

A.1220

u. Michael P. Cooke failed to develop the fact that the trial counsel failed to introduce into evidence two reward posters to impeach the credibility of Pat Adams and James Taylor.

v. Michael P. Cooke failed to develop facts that the trial counsel failed to object to the introduction of Petitioner's radio interview.

w. Michael P. Cooke failed to develop facts that trial counsel failed to elicit evidence of a statement Officer Whitt made in Petitioner's presence.

aa. Upon appeal of the Habeas Corpus Decision Michael P. Cooke placed a statement in his brief that was highly detrimental and prejudicial to petitioner. He stated that the victim was taken to Bluefield Regional Medical Center (hereinafter "BRMC", where he died from the multiple gunshot wounds. The petitioner's wife was employed at BRMC, and was working at the time the victim was shot and taken to BRMC for treatment. Upon learning of the shooting that transpired, she left work and went home to the crime scene.

bb. Michael P. Cooke failed to perfect his appeal of the circuit court's denial of habeas corpus by failing to point out that the court used the wrong standard to rule on a denial of a continuance. He further added failure to move the court for a change of venue; eliciting evidence at trial that placed the petitioner in a negative light; and failure to have the petitioner undergo a competency evaluation.

cc. Michael P. Cooke failed to advise the Petitioner at his omnibus hearing when he advised him not to waive his attorney-client privilege when Elizabeth French was testifying.

dd. Michael P. Cooke failed to develop facts that one of the defense witnesses, James Taylor, who changed his testimony at trial received money inside the courthouse from the victim's sister.

ee. Michael P. Cooke failed to render effective assistance to Petitioner at the omnibus hearing by failing to allege that cumulative error at the underlying trial denied him a fair trial. Under this sub-division Petitioner alleges twenty-four sub-grounds and those are listed as follows:

1. Trial Counsel's failing to object to the prosecutor's prejudicial remarks;

2. Trial Counsel's failure to call Stephen P. King, the fingerprint examiner to testify;

3. Trial Counsel's failure to object to Detective Helton's and the medical examiner's

30

A 1221

testimony as to toxicology reports which they did not prepare;

4. Trial Counsel failed to adequately cross-examine Detective Helton;

5. Trial Counsel failed to move to quash the indictment because of false and misleading grand jury testimony.

6. Trial Counsel failed to adequately cross-examine Detective Helton;

7. Trial Counsel failed to call the actual person who performed the toxicology testing;

8. Trial Counsel failed to call a witness to impeach the credibility of Pat Adams, state's witness;

9. Trial Counsel failed to call as witnesses John and Tammy Worley who allegedly would testify that the victim had broken into their home.

10. Trial Counsel failed to move for a mistrial after the prosecutor implicated that the defense had a duty to bring in a witness.

11. Trial Counsel failed to recall Whitt to testify after Brook's testimony contradicted is testimony.

12. Trial Counsel failed to recall Whitt to testify about the positioning of the victims body.

13. Trial Counsel failed to move for a mistrial after the testimony of Officer Whitt failed to corroborate the prosecutor's statement that Mrs. Hubbard came home and cleaned up before the police came back to complete their investigation;

14. Trial Counsel failed to object to state and county officials serving on the jury;

15. Trial Counsel failed to object to the prosecutor's misleading remarks about the weapon the petitioner used in the crime.

16. Trial Counsel failed to object to Petitioner's radio interview coming into evidence.

17. Trial Counsel failed to adequately cross-examine Officer Whitt about the dimensions of the room in which the shooting took place;

18. Trial Counsel failed to introduce evidence of bullet hole patterns which were consistent with self defense;

19. Trial counsel failed to introduce evidence that the victim stole a bicycle out of Petitioner's yard two weeks prior to the shooting;

31

A 1222

20. Trial Counsel failed to properly investigate and call rescue squad members to testify as to the position of the victim's body when they arrived on the scene;

21. Trial Counsel failed to adequately cross-examine Officer Whitt with regard to the distance of the body of the victim from where Petitioner shot the victim;

22. Trial Counsel failed to present evidence of reward posters;

23. Trial Counsel failed to present Virgie Hubbard to testify that the victim walked into her bathroom when she was taking a bath and Trusby Hubbard to testify he saw the victim spying on his mother while she was bathing;

24. Trial Counsel failed to introduce a statement made by Officer Whitt to the Petitioner on the night of the shooting.

In addition, Petitioner alleges the following grounds:

1. Trial Court's failure to grant a continuance so defense counsel could locate a witness.

2. The lack of a preliminary hearing.

3. Ineffective assistance of counsel.

4. Prosecutorial remarks during closing argument.

5. Justification of shooting under W. Va Code, 55-7-22.

6. Insufficiency of evidence to convict.

64. Petitioner Dennis Gale Hubbard is presently incarcerated in the Stevens Correctional Center of the West Virginia Division of Corrections.

65. Dennis Gale Hubbard duly filed a POST-CONVICTION HABEAS CORPUS FORM APPLICATION TO PROCEED IN FORMA PAUPERIS AND AFFIDAVIT and it is clear from the contents thereof that he is eligible for Court appointed counsel.

On June 19, 2012, Honorable Menis E. Ketchum, Chief Justice of the Supreme Court of Appeals of West Virginia appointed the undersigned Judge, John S. Hrko, for the purpose of presiding in said Petition for Writ of Habeas Corpus.

By Order dated February 21, 2013, the court granted a Writ of Habeas Corpus, ordered the state to file an answer within 30 days and appointed Paul C. Cassell, an Attorney eligible for appointment to represent indigent defendants in Mercer County, West Virginia, to represent

32

A1223

Dennis Gale Hubbard.

66. By letter of August 19, 2013, the state conceded that petitioner had received ineffective assistance of counsel with regard to his prior habeas corpus petition( The Appeal of a prior Habeas Corpus Decision). The state did not object to an Order granting the relief of a new habeas corpus proceeding.

67. On December 02, 2013, an Amended Petition for Writ of Habeas Corpus, checklist of grounds asserted or waived and Memorandum in Support of Amended Petition for Writ of Habeas Corpus was filed by Paul Cassell, court appointed Counsel for Dennis Gale Hubbard.

68. The Amended Petition for Writ of Habeas Corpus sets forth the following grounds:

a. Ineffective assistance of trial counsel.

(1) Counsel failed to adequately investigate the case.

(2) Counsel was ineffective in addressing constitutional error.

(3) Counsel was ineffective in communicating with petitioner, insufficient description of the crime scene, challenging the position of the victim's body, failed to prevent hearsay testimony, prosecutor argued facts outside the admitted evidence, prosecutor offered opinion evidence without proper foundation,

b. Cumulative error.

c. The Castle Doctrine requires a new trial.

d. Losh List.

69. The Losh List attachment sets forth the following additional grounds for relief:

a. Prejudicial pre- trial publicity.

b. Coerced confessions.

c. States knowing use of perjured testimony (inconsistent statements).

d. Excessiveness or denial of bail.

e. Ineffective assistance of counsel.

f. No preliminary hearing.

g. Refusal of continuance.

h. Refusal to subpoena witnesses.

I. Constitutional errors in evidentiary rulings.

33

j. Instructions to jury (Castle Doctrine).

k. Claims of prejudicial statements by trial judge. (Regarding continuance.)

l. Sufficiency of Evidence.

m. Excessive sentencing.

70. On November 10, 2014, a trial on an Omnibus Petition for Writ of Habeas Corpus in this case was held in the Circuit Court of Mercer County, West Virginia, and attended by Petitioner, Dennis Gale Hubbard, in person, Paul Cassell, Esq., counsel for Mr. Hubbard, and Scott Ash, Esq., counsel for the Respondent, Marvin C. Plumley, Warden.

71. At the evidentiary hearing Petitioner called to testify Jeffrey Wayne Pike, Elizabeth A. French, James Palmer, Dennis Gale Hubbard, Jr., and Dennis Gale Hubbard. The following exhibits were presented on Petitioner's behalf: No. 1. Report made by Petitioner's Expert Witness Jeff Pike. No. 2. Bluefield Police Department Complaint Report, No. 3. West Virginia State Police Forensic Laboratory Report/Toxicology Report. No. 4. Statement of Tammy Worley. No. 5. Statement of Clinton Hawkins. No. 6 Statement of Tammy Hawkins. No. 7 Elizabeth French witness list. No. 8 French Subpoena List. No. 9 Statement of John Worley. No. 10. Statement of Antonio Frazier . No. 11. Statement of Glen Dale Hubbard.

72. Petitioner wished to call four (4) additional witness by deposition and the State did not object. Those witnesses were Dr. Shaker, Justen Hawkins, Tammy Hawkins and Officer R. D. Davis. These four depositions were to be completed prior to December 31, 2014. The depositions of Adel Shaker, M.D., Justin Hawkins, and Tammy Hawkins were taken on December 30, 2014. It was determined by Counsel for Petitioner that there was no useful information that could be obtained from Officer R. D. Davis, because he did not even remember being in the house of the Petitioner.

73. At the beginning of the Omnibus Habeas Corpus Proceeding the parties agreed to stipulate as follows:

(1) All the criminal record in the underlying proceeding .

(2) All exhibits either have filed with regard to this petition.

(3) Underlying criminal case record and all exhibits.

(4) The record of the prior Habeas Corpus Hearing.

A 1225

74. **Jeffrey Wayne Pike.** This witness testified that he is the CEO of "Complete Surveillance Investigative Services", of Wythe County, Virginia, and was called as Petitioner's first witness. Mr. Pike was a former game warden, city police officer and general law enforcement. In the state of Virginia, he is a general instructor on a wide range of topics. When offered as an expert on police procedure, crime scene analysis and investigative technique, there was no objection by the State and he was, therefor, recognized as an expert.

He testified that he reviewed documents, exhibits, reports, photographs, etc. He felt that the police scene investigation did not even reach the "minimum of normalcy" in any agency and did not even come close to being adequate. He had trouble with the time line, and had difficulty understanding that while the crime scene was being processed by one or two officers, one officer transported Petitioner to headquarters so that Lt. Helton could take his statement. Lt. Helton had not been to the scene at that point and when he arrived at police headquarters, Petitioner was sitting in the hall.

He took issue that some of the people who lived in the house were allowed to remain after the police did their work and left. He thought it was just a mess, even though all of the witnesses were known, Petitioner admitted he shot Ricardo Lee, witnesses saw a knife and some didn't, photos were taken, the knife found was sent to the Department of Public Safety and blood samples from Ricardo Lee were sent to the Department of Public Safety. There were live fact witnesses and this was a clear self defense case. This was not a case of an unknown perpetrator nor necessity of a "television CAI" performance.

75. **Elizabeth French.** Ms. French testified that she was trial counsel for Petitioner and had hired an investigator named Ms. Roebuck. The investigator took a statement from Tammy Worley, Justin Hawkins, Tammy Hawkins and John Worley.

Her client was asserting self-defense, defense of himself and defense of his home. She did not call Ms. Worley to testify because she believed the case rested upon Petitioner himself and his testimony. She also stated that Ricardo Lee was an unwanted guest and there was no dispute that he kicked the door in and entered the Petitioner's home. Regardless of all the witnesses and issues she believed the case turned on Petitioner's story, his conduct and self defense. She further acknowledged the statement of Ms. Worley that Ricardo Lee broke into her

35

A 1226

house on a previous occasion.

The statement of Justin Hawkins was in Ms. French's possession prior to trial and that statement related to the testimony of Pat Adams. Mr. Adams testified that Petitioner said he was going to "kill him a niggar". Justin Hawkins was allegedly going to testify that Petitioner did not make such a statement. Ms. French said Pat Adams was a terrible witness and difficult to understand. She seemed to state that the reason she did not use Justin Hawkins was the fact that he was 16 years of age, nobody on the jury could understand Mr. Adams, Justin was riding a bike up and down the street while Petitioner was talking with Mr. Adams, and she had an opinion that he did not hear the entire conversation. Adams' knowledge of a reward was not a huge issue when they were preparing for trial. Justin Hawkins also would have testified with regard to Ricardo Lee's reputation for drugs and violence.

Ms. French also testified that she had a statement from Tammy Hawkins that stated, among other things, that there were reward posters of $10,000.00 around town , that she knew that the Hubbards had asked Ricardo Lee to leave their property, and Lee had a reputation for a propensity for violence. She explained that all of the State's witnesses testified to those facts, it was not a trial issue and furthermore it was simply not an issue. Everyone in the trial knew Ricardo Lee burst into the house and was an unwanted guest.

She subpoenaed several witnesses, but did not call them all. The State witnesses were cross-examined by her and established the information she needed from them. She had the witnesses there "Just in case." Pat Adams was such a horrible witness and Ms. French knew his daughter could had testified to the same facts. When the State did not call her, she just left the issue alone. This was clearly a trial tactic.

When John Worley's testimony was mentioned as a witness and she said, "....it simply wasn't an issue that Mr. Lee was an unwanted individual in Mr.. Hubbard's house that evening. It simply – it was uncontested." She was of the opinion that it was not a trial issue as well.

She was also asked why she did not call Andre Frazier, because he had seen Ricardo Lee with a knife. She said they attempted to locate him and failed to do so. Mr. Cassell did not subpoena him for this hearing as well. Ms. French moved the court for a continuance, but the motion was apparently denied and Mr. Frazier was nowhere to be found for the trial.

36

A0227

Ms. French said she only called two witnesses because all of those present in the house when the event occurred were called by the State. She added that Dennis had to testify and he did not present well to the jury to maintain a self-defense claim. There were so many things that the State did not dispute, but it still came down to Petitioner's testimony and she could no nothing about that issue.

She had no memory of her pre-trial visits with the Petitioner. She recalled three jail visits and going a fourth time, but on the fourth occasion Petitioner was unavailable. She talked to him on the phone and would rely on Petitioner's testimony for the number of times he called. The trial strategy was always up front. It was a self-defense case. She also agreed that there may have been other witnesses Petitioner wanted called.

Cross-examination by Mr. Ash revealed that Ms. French had adequate time to prepare for trial and that Mr. Palmer was co-counsel. She revealed that she worked for the Public Defender's Office and had practiced law from 1997 to 2006 and all her cases were criminal cases.

She felt that Petitioner was a stubborn individual who felt a sense of self-righteous indignation over even being charged with a crime and it came across at the trial during his testimony and there was no way that could be fixed. He also gave an interview where he sounded like he was gloating about the shooting having happened. She said he had to testify because it was a self defense case.

She testified that she would have called Trusby Hubbard, Mark Heaton and David Pleasants if the State had not called them.

She said it came down to the testimony of Petitioner and that he had a total lack of remorse and he came across as gloating and proud of the fact that the shooting occurred.

76. James Palmer. This witness testified that he was an attorney in Mercer County, West Virginia, in 2006, and was court appointed to act as counsel for Petitioner in the underlying criminal case along with Ms. French. .

It appears Ms. French was lead counsel, and Mr. Palmer remembered talking with Petitioner, but did not remember where. He did not remember a lot of the details of the case from eight years ago.

A1238

On cross-examination he did remember that they did not think any type of expert was necessary, but the main issue was strategy. They had to frame the case to show that Petitioner was not gunning for Ricardo Lee.

He had cross-examined Pat Adams and remembered him as having a hearing and articulation problem. He and Ms. French had gone to the scene of the shooting and interviewed some witnesses. They went through the Hubbard house. At that time he had participated in three prior murder trials.

77. **Dennis Gale Hubbard, jr.** The witness is the son of Petitioner and he was in the home in 2007 and saw three bullet holes. Two in the wall and one in the window.

He was a former taxi driver and knew Ricardo Lee. Lee would stiff him on the taxi fare.

78. **Dennis Gale Hubbard, Sr.** He testified that Paul Cassell was his court appointed counsel and that his attorney followed his instructions with regard to the issues he wished to present. They began talking about his trial attorneys. He said he talked with Ms. French three times at the jail, as much as three times on the phone and talked with her during the trial. He said she did not discuss trial strategy with him or prepare him to testify. He denied her counseling him on how to present himself to the jury. She did give him a list of witnesses, but did not discuss them. He gave her the names of witnesses, but she failed to call them to testify. His witnesses would have testified to bullet holes in the walls, the Officer who transported Trusby and him to the police department and who followed the ambulance to the hospital with Ricardo Lee. The witnesses also knew Pat Adams.

In regard to Pat Adams, they knew he was a pathological liar and would do anything for money. He also wanted Kenny Corrick to testify that Mark Heaton's bicycle had been stolen. When he asked her if she was going to call the Hawkins, she said it would more harm than good. He knew there were already self-defense laws that had already been ruled upon that say quite plainly that he committed no crime. He also thought that there should have been detailed crime scene drawings. He did not agree with the room size as laid out on the Courtroom floor. There may have been a 2 foot variance on length or width.

He did not know about the availability of a jury view and the house is gone now. Ms. French did not properly address the physical positions of himself and Mr. Lee. He felt this was

38

A1229

important with regard to Mr. Lee, after he was shot. He was of the opinion that the State's witnesses were telling the jury an "outright lie". He said the attorney for the State told the jury Petitioner's wife cleaned up the scene and it was not true because Jimmy Taylor did the cleaning. There was no evidence that his wife hurried home to clean.

He testified that co-counsel, Mr. Palmer, had no contact with him until the trial and all of his pre-trial conferences were with Ms. French.

He stated he had concerns about a statement he allegedly gave to Adventure Radio which was played for the jury at the close of the State's case. He filed a civil action against the radio station after his conviction. Now he says in his Habeas Corpus testimony that it was in fact a police officer and the man was not brought forth to be cross-examined at the trial. He believed that it was "never passed in law that you could use a cassette tape in the courtroom or an electronic recording devise (sic.) tape)."

Counsel for Petitioner then directed the Petitioner to the Losh list and the issues he raised were as follows:

a. Prejudicial pre-trial publicity. This was related to Newspaper Articles and he testified that they were false. It was reported that he shot a man with a .38 when, in fact, he used a .380. One is a revolver and the other is a semi-automatic. They also reported it was a 9 mm. It was strange that a newspaper reporter was at the top of the steps when he was brought to the courthouse. It also reported Ricardo Lee was in his doorway when he was well inside his house. He believed that it was "clear cut perjury".

b. Inconsistencies of where Ricardo Lee was lying at the time the police entered the house.

c. Coerced confessions. This relates to the Adventure Radio interview. It indicated that a crime was committed when it was not true. He tried to relate this issue to false statements made by Mr. Taylor, who lived in his house. Mr. Taylor apparently testified three times; grand jury, trial, and this case. There was some differences as to how and when he saw a knife.

d. Ineffective assistance of counsel. He said this ground was set forth in his brief.

e. Excessiveness or denial of bail. There was no testimony as to this matter.

f. Lack of preliminary hearing. This is true. He was indicted without a warrant being issued by a magistrate.

39

g. The Court refused a continuance because the defense could not locate Andre Frazier and Thomas Hankins.

h. Refusal to subpoena witnesses. Ms. French did not subpoena witnesses from a McDowell County Police Department to testify as to the bad reputation of Pat Adams. The Worley were not brought forward and Tammy and Justin Hawkins were subpoenaed and never put on the stand.

I. Constitutional error and evidentiary rulings. He related this ground to the Adventure Radio Statement, false statements made by the police officers who testified at the trial, and failure to give an instruction on the "Castle Doctrine".

k. Prejudicial Statements made by the Judge at sentencing and denying his motion for a continuance. He alleges that the judge said "You disgust me."

l. Prejudicial statements made by the prosecutor. He related this to the condition of the house and asking questions that elicited lies from the witnesses.

m. Sufficiency of evidence. Self defense.

n. Excessive sentencing. He received a 40 year sentence, which is according to statute.

o. Failure to appoint preferred counsel.

p. Grand jury. Only Lieutenant Tom Helton was used before the grand jury.

q. Statements made by Prosecutor. In the grand jury room they said Dennis Gale Hubbard was charged with first degree murder.

r. Inadequate instructions. Castle Doctrine. No crime committed.

s. Trial testimony that J. T. Brooks told him to put his gun inside and he did not need to be carry it outside. He had called the police due to threats made by a man with a gun. His attorney did not cross-examine him about that issue. There was nothing else in the record to indicate that it was ever an issue.

t. Pat Adams lied about the reward money. He said he didn't catch all of what Mr. Palmer was talking about.

Upon cross-examination by Mr. Ash, Petitioner said he was 7 feet from Mr. Lee when he first shot him. He also said Mr. Lee got within 2 feet from him. At this time Petitioner used the diagram on the courtroom floor and the location of the table ( as the piano) to say he was backing away from Lee while he was shooting. There was a discussion about the taped interview and

40

A1231

Petitioner said Ms. French gave him a copy of a transcript before the tape was played. She said it was the radio interview I did with Adventure Radio. It had police written on the surface.

After the Petitioner temporarily rested, the Court asked Mr. Ash if he had any witnesses and he stated that he had intended to call Ms. French as a witness, but since Petitioner called her and he cross-examined her, it was not necessary.

Petitioner's counsel asked to submit four depositions of witnesses who could not appear.

79. Adel Shaker, M. D. This witness got both his medical and law degree overseas. He is a pathologist. He is the chief medical examiner in Nueces County, Texas, as has been so employed for seven months. During his entire career he said he has done 9, 750 autopsies. He said he also did toxicology reviews. It was stipulated that he was an expert in forensic pathology.

In this case he is a hired expert and he received an autopsy report, toxicology report and autopsy photographs. All reports indicate that Ricardo Lee was acutely intoxicated. His condition was consistent with a person being in a status of rage and he would be involved in fights or physical altercations. He also received a blood transfusion and fluids. These diluted his medication and alcohol level and the findings on the toxicology report would be higher. It would also flush out some medications.

When asked about the gunshot wounds he praised the findings of Dr. Mahmoud and agreed that all shots were from front to back. He said those types of wounds give the impression of a confrontation. All of his work and opinions were to a reasonable degree of medical certainty.

On cross-examination the Doctor could not estimate how much higher the alcohol levels could rise. Given the history of daily drinking, transfusion and fluids the blood alcohol should have been higher at the time he was shot. However, he could not say how much higher. He also agreed with the cause of death stated by D. Mahmoud and all three chest wounds were fatal. When Mr. Ash asked if there was any way of telling which bullet struck first, the doctor answered that there was no scientific method for that determination. The distance between the Petitioner and Ricardo Lee was "beyond two feet".

80. Tammy Hawkins. This witness was on the witness list prepared by Ms. French and she had a statement taken from this witness by Ms. Roebuck. She knew of Mr. Lee's reputation of being

41

A1232

a crack addict and her son had had trouble with him at one point in time. He threatened to beat her son up and cut his head off and it happened down at Petitioner's house. Ricardo Lee was a bully and her son was afraid of him. On more than one time Petitioner and his wife made it clear to her that Mr. Lee was not welcome in their home. On several occasions she was there Mr. Lee just walked in without knocking and it was an ongoing problem. Petitioner had called the police on Ricardo Lee at a time when she was in the house.

When asked if Mr. Adams said anything to her about a reward, she said ...I could not understand Mr. Adams when he spoke." Basically she just knew that they got a new car about that time. On cross-examination she said she could not really say how they got the car.

She was present at the Hubbard's home the morning after the shooting and saw bullet holes in the wall and floor.

She agreed that Ricardo Lee would leave the house when told, but his departure was reluctant and argumentative. She was not subpoenaed to trial in the case, but remembers talking to a female investigator. She spoke with Petitioner's counsel Elizabeth French and she told her she would hurt Petitioner more on the stand than she would help him.

**81. Justin Hawkins.** Mr. Hawkins testified that he lived at 221 Poplar Street, Bluefield, WV at the time of the shooting and on the day of the deposition, he knew Mr. Hubbard and Ricardo Lee. He referred to Petitioner as a kind man who wouldn't hurt a fly, and a good friend of his. Ricardo Lee, on the other hand, was an alcoholic, drug addict, troublemaker and neighborhood nuisance. He could not remember why, but Ricardo Lee threatened him when he was a teen-ager and Mr. Lee was intoxicated. He was also present when Ricardo Lee threatened Mark Heaton and Trusby Hubbard.

When asked if Ricardo Lee carried a knife he said that he carried a folding knife and would often have it opened and visible.

He stated that an investigator took a statement from him and his mother and they both attended the trial, but were never called as witnesses.

After the shooting he went to the Petitioner's house and saw bullet holes in the walls. It, therefore, appears that some projectiles went through Ricardo Lee or Petitioner fired more that the 10 rounds to which he admitted firing.

42

A1233

He was at the Petitioner's home the day prior to the shooting and recalled Petitioner asking Ricardo Lee to leave twice. After the second time, Lee left. He said Petitioner's next door neighbor accused Lee of stealing something, but he could not say what he was accused of stealing. That neighbor was one Annie Silcox.

Cross-examination by Mr. Ash revealed that Ricardo Lee was always drinking because you could smell alcohol in his presence. He could not remember if Lee was ever violent when asked to leave. He denied even seeing Petitioner wearing a gun. He also stated that Ricardo Lee always carried a folding knife. Neither he nor his mother, Tammy Hawkins, ever had a violent conversation with Ricardo Lee.

He was told to be at Court, but never spoke to the lawyers for Petitioner.

At the close of his testimony he was offered the option to waive or read and sign his deposition. He said he would like to read it, but there was no place where he signed the deposition and the undersigned's copy is marked "ORIGINAL".

82. OFFICER R. D. DAVIS. This witness was never deposed because he told Petitioner's Counsel that he did not remember being at the scene of the shooting. His testimony was sought to prove there were bullet holes in the wall. (Closing Arguments Tr. 6).

## CONCLUSIONS OF LAW:

In Losh v. Mckenzie, 166 W. Va. 762, 277 S.E.2d 606 (1981), with regard to Petitions for Writ of Habeas Corpus, the Court decided that at the conclusion of the hearing the judge should enter a comprehensive order which addresses not only the grounds litigated, but the grounds waived as well.

On December 02, 2013, Petitioner and his Counsel filed a "Checklist of Grounds Asserted or Waived in Post-Conviction Habeas Corpus Proceeding". Both signed the document and it was filed in the Office of the Clerk of the Circuit Court of Mercer County, West Virginia, on the same day. All grounds checked on the "Checklist" as waived may not be asserted in future habeas corpus proceedings absent unusual circumstances, such as the ineffective assistance of counsel at the habeas corpus proceeding, or the retroactive application of new rule of law applicable to petitioner's conviction. The signature of the Petitioner on the checklist shall be his certification that he has discussed the effect of this form with his attorney, and that he

43

A1234

understands that all grounds checked as "waived" may not be asserted later.

The grounds specifically waived in this Habeas Corpus proceeding are as follows:

Trial Court lacked jurisdiction

Statute under which conviction was obtained was unconstitutional

Indictment shows on face no offense was committed

Denial of right to speedy trial

Involuntary guilty plea

Mental competency at time of crime

Mental competency at time of trial

Incapacity to stand trial due to drug use

Language barrier to understanding the proceeding

Denial of counsel

Failure of counsel to take appeal

Consecutive sentences for same transaction

Suppression of helpful evidence by prosecutor

Falsification of a transcript by prosecutor

Unfulfilled plea bargains

Information in pre-sentence report erroneous

Double jeopardy

Irregularities in arrest

Illegal detention prior to arraignment

Irregularities or errors in arraignment

Challenges to the composition of grand jury or its procedures

Failure to provide copy of indictment to defendant

Defects in indictment

Improper venue

Pre-indictment delay

Prejudicial joinder of defendants

Lack of full public hearing

A1235

Nondisclosure of Grand Jury minutes

Refusal to turn over witness notes after witness has testified

Claim of incompetence at time of offense, as opposed to time of trial

Claims concerning use of informers to convict

Acquittal of co-defendant on same charge

Defendant's absence from part of the proceedings

Improper communications between prosecutor or witness and jury

Question of actual guilt upon an acceptable guilty plea

Severer sentence than expected

Mistaken advice of counsel as to parole or probation eligibility

Amount of time served on sentence, credit for time served

The issues that should be addressed in this Order are as follows:

Prejudicial pretrial publicity

Coerced confession

States knowing use of perjured testimony ( inconsistent statements)

ineffective assistance of counsel ( multiple issues)

Excessiveness or denial of bail

No preliminary hearing

Refusal of continuance

Refusal to subpoena witnesses

Constitutional errors in evidentiary rulings

Instructions to jury (castle doctrine)

Claims of prejudicial statement of trial judge ( regarding a continuance)

Sufficiency of evidence

Excessive sentence

## DISCUSSION OF ISSUES AND GROUNDS FOR HABEAS CORPUS.

### CONCLUSIONS OF LAW

In Losh v. Mckenzie, 166 W. Va. 762, 277 S.E.2d 606 (W. Va. 1981), the West Virginia

Supreme Court of Appeals held that an omnibus habeas corpus hearing provided in W. Va. Code,

45

A1236

53-4A-1, et seq. (1961) traditionally occurs when an applicant is represented by counsel or pro se, the trial court inquires into all the standard grounds for habeas corpus relief, a waiver of those grounds not asserted is made by the applicant upon advice of counsel, a hearing is held and at the conclusion of the hearing the Court will address each and every ground asserted and specifically state which grounds have been waived.

Having listed all of the grounds waived by the Petitioner based on the Losh List which came out of that case, the Court will address each and every ground asserted and not waived.

**PREJUDICIAL PRE TRIAL PUBLICITY.**

This ground for relief usually manifests itself in a motion for change of venue filed by counsel for a defendant in a criminal case. There is a myriad of defense motions which can be filed and heard in a criminal prosecution. But, defense counsel must apply their skills to file only those motions which are relevant and have a valid basis in fact.

A convicted felon does not usually care what is relevant and what is valid . Often they will insist all types of motions be filed and that Counsel spend every minute of every day and year filing motions and having hearings to seek their release.

Most lawyers file only motions which are valid and have some basis in fact and it relates purely to their trial strategy and tactics. This is done so as to not to let the jury see their case as a stack of useless arguments.

The docket sheet in this case indicates that the Petitioner was indicted by a Mercer County, West Virginia, grand jury and it was filed in the Office of the Clerk of the Circuit Court of Mercer County, West Virginia, on February 15, 2006. The trial of the case began on August 29, 2006.

Voir dire is another stage of a trial where prejudicial pre-trial publicity can often raise its head. When the clerk asked, "Do you know of anything about the case by having heard the evidence or otherwise" none of the jurors answered in the affirmative. (Vol. 1 Tr. 11).

The State asked if anyone had heard of the shooting before and there was no answer. (Vol. 1 Tr. 13). These are the results of all questions asked of the jury on voir dire.

During the Habeas Corpus Hearing Petitioner said the prejudicial pre-trial publicity resulted from false statements Lt. Helton gave to the Bluefield Daily Telegraph. He stated that

A1237

Lt. Helton stated that Petitioner shot a man 10 times with a .38 as opposed to a .380 and another time he said it was a 9 millimeter. He also told the paper that Ricardo Lee was in the doorway as opposed to well inside the house. This may all be possibly true but the fact that no juror ever heard about the case would nullify any possibility of prejudice. State v. Williams, 172 W. Va. 295, 305 S.E.2d 251(1983). (HC No. 135-136).

## COERCED CONFESSION.

This allegation was related to a voluntary radio interview the Petitioner gave to the Adventure Radio Station.(HC No. 137). Petitioner's lawyer, Ms. French, stated that in the radio show interview her client gave, he came across as gloating and proud of the fact that the shooting had occurred. He sounded like he had an utter lack of remorse. This was no confession, it was a voluntary opportunity for Petitioner to address the public. Coerced confessions usually have to do with statements given to law enforcement officers, not radio stations.(HC No. 95).

There was no allegation that the statement he gave Lt. Helton on the night of the shooting was coerced. That would have been a situation where the alleged coerced confession issue would have been relevant.

## STATE'S KNOWING USE OF PERJURED TESTIMONY.

Petitioner stated this ground was simple because no crime was committed, the mentioning of different caliber guns (not during the trial) and bullets going out the doorway when they did not. He also related this issue to the fact that the testimony of various witnesses was conflicting. Even the testimony of Mr. Taylor that he saw Ricardo Lee with a knife (Vol. 11 Tr. 12) and later "I just told him he needed to leave and that's when I saw the knife". (Vol. 11 Tr. 33) and later still when he said "I did not see a knife in the beginning". Then he agreed that he did not see the knife until Ricardo Lee was on the floor. (Vol. 11 Tr. 36). Those of us who have tried cases with several witnesses to the same event know that one never know how a witness will see or perceive an event.

Petitioner went on to testify that this ground for relief related to Lt. Helton's testimony at the trial and grand jury, but merely said they were conflicting.

## INEFFECTIVE ASSISTANCE OF COUNSEL.

The U. S. Const. Amend. VI, provides that a defendant in a criminal case is entitled to

47

*A1238*

assistance of Counsel for his defense. This concept is also set forth in W. Va. Const. Art. III, §

14. These two constitutional provisions not only assure a defendant the right to counsel, but also

assure that one receives competent and effective assistance of counsel.

The most prevalent authority with respect to the right to counsel was enunciated by the

United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). It its opinion,

the Court established a two prong test to determine whether or not performance of trial counsel

met the standard contemplated by the United States Constitution. That is, (1) was trial counsel's

performance deficient under an objective standard of reasonableness; and (2) there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings

would have been different.

In reviewing counsel's performance in an underlying criminal case, the Court must apply

and objective standard and determine whether, under the facts, the identified facts or omissions

were outside the broad range of professionally competent assistance while at the same time

refraining from engaging in hindsight or second-guessing the reasons for his decisions. One

must ask whether a reasonable lawyer would have acted as defense counsel did in the principal

case. State ex. Rel. Strogen v. Trent, 196 W. Va. 148, 469 S.E. 7 (1996).

Petitioner sets forth several individual grounds that he alleges constitutes a totally

ineffective performance by trial counsel.

The first of those grounds is that the trial counsel was ineffective in failing to adequately

investigate the case. In State ex Rel. Strogen v. Trent, (Supra), "The West Virginia Court held

that the fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's

investigation." It further stated that there is a strong presumption that counsel's conduct falls

within the wide range of reasonable professions assistance, and judicial scrutiny of counsel's

performance must be highly deferential. Counsel must, at a minimum conduct a reasonable

investigation which enables her to make informed decisions about how best to present criminal

defendants. However, the presumption is simply inappropriate if counsel's strategic decisions

are made after an inadequate investigation. State ex rel. Daniel v. Legursky, 195 W. Va. 314,

465 S.E.2d 416 (1995).

(a) Petitioner alleges that counsel failed to adequately investigate witness Pat Adams to

48

determine his credibility.

It appears that there were two police officers from McDowell County, West Virginia, whom Petitioner believed would give damaging evidence of some nature as to the character of Pat Adams. (HC No. 139).

Pat Adams' testimony is on pages 155 to 176 of T.C. Vol. ll. According to the record he was suffering from hearing loss, talked too fast, many answers he gave were inaudible. At one point the Judge suggested leading questions and had the witness stand in front of the jury box. Many of his answers were simply unresponsive to the questions he was asked and he stated many times he could not hear.

He testified that after the flood of 2002 he moved from Welch to Bluefield. According to the record he was interviewed by Ms. French's investigator, Jessica Roebuck, but Mr. Adams could not verify the fact. At one point he testified that Ricardo Lee drank on the job and never stole anything from him. Moments later he said Lee stole from him, but he could not prove it in Court. Then again he said Lee did not steal anything from him.

He agreed that he heard Petitioner say he was going to kill him a nigger son of a bitch. No other witness was called to verify the racial comment. When Ms. French testified in the Habeas Corpus Hearing, she described Mr. Adams as a horrible witness both for Mr. Hubbard and for the state. He was exceptionally inarticulate. She said she and co-counsel met with him prior to the trial and they knew what to expect. She related that calling Mr. Adams inarticulate was an understatement and added, "To be quite blunt you could not understand the man when he spoke." (HC No. 58) When asked about Mr. Hawkins, she said he was a kid riding a bike and said he was present at the time this alleged statement was made. It was her opinion that Hawkins was not present the entire time and would not have been privy to everything. Mr. Hawkins went on to discuss Ricardo Lee's reputation for drug use and other matters. Ms. Hawkins said Mr. Lee forced his way into the Hubbard home. Ms. French said she did not use these statements because there was no issue. It was undisputed that Lee forced his way into the house, he was not an invited guest, and he was not welcomed by Mr. Hubbard. It was not a trial issue. She did not think it was necessary because the State's witnesses verified the matter. Obviously she believed it better to leave Mr. Adams alone and let his testimony stand rather than

49

A1240

put another person on who would testify to the same thing or put a young witness on the stand who was riding up and down the road while the conversation was occurring.

Both of the Hawkins were on the witness list, but she did not believe it was required to call them to testify.

(b) Trial counsel was ineffective in failing to adequately investigate witnesses demonstrating a pattern of burglary.

At the time of the shooting the following witnesses were present in the house of Petitioner.

1. Dennis Hubbard

2. Trusby Hubbard

3. David Pleasants (Spanky)

4. Mark Heaton

5. Jimmy Ray Taylor

6. Ricardo Lee

Each and every one of the witnesses present at the shooting, with the exception of Ricardo Lee, testified during the trial. Each and every one of the witnesses testified that Ricardo Lee forced his way into the house, that he was a habitual user of alcohol and some added crack cocaine. Many of these witnesses were Witnesses for the state and were effectively cross-examined by defense counsel and either on direct testimony or cross-examination testified to the issues Petitioner raises in this Petition for Writ of Habeas Corpus.

Dietz v. Legursky, 188 W. Va. 526, 425 W.E.2d 202 (1992), provides that it is competent for the defense to prove the character or reputation of the deceased as a dangerous and quarrelsome man, and also to prove prior attacks made by the deceased upon him, as well as threats made and if the defendant has knowledge of specific acts of violence by the deceased against other parties, he should be allowed to give evidence of those events. This begs the question of where does this line of testimony stop? How many witnesses are necessary? Is this line of questioning relevant in this case? Was it necessary to subpoena each and every witness in Bluefield that had any type of altercation with or saw Ricardo Lee use alcohol?

Even in the Court's instructions it says " You are not bound to decide in conformity with

50

the testimony and evidence of any number of witnesses which do not produce conviction in your mind, against a less number, or against a presumption of law or other evidence. In other words, it is not the greater number of witnesses that should control you where their testimony does not satisfy you and produce moral conviction that they are telling the truth. It is upon the quality of the testimony, rather than the quantity or the number of witnesses that you should act, providing it produces in your minds a moral conviction and satisfies you of its truthfulness." A similar instruction such as this is given in most trials conducted in the State of West Virginia.

In State v. Taylor, 105 W. Va. 298, 142 S.E. 254 (1928), which is still good law on the point that it is the duty of the jury to receive, weigh and consider evidence. With regard to this received evidence they should consider it and give it the weight they believe it deserves.

(c) Trial counsel was ineffective in failing to adequately investigate whether expert testimony or lay testimony could have better supported petitioner's justification defense. Throughout this case Petitioner and trial counsel took the position that this was a case of self defense and defense of home. This fact was even recognized by the State. There were 5 eye witnesses and the Petitioner admitted he shot Ricardo Lee 10 times. What possible need for expert testimony existed? Do use expert testimony for expert testimony's sake? I do not see any possible need for expert testimony in this factual scenario. This case was investigated by experienced police officers who collectively had many years with the department and they all knew this was a simple self defense case.

(d). Trial counsel was ineffective in addressing constitutional error. At the trial of this case the investigating officer and the State's Medical Examiner testified that there were no fingerprints on the knife, there were no cocaine metabolites in the victim's blood and Ricardo Lee had a blood alcohol of 0.17 (twice the amount of the legal limit).

This error allegedly was compounded by the failure of trial counsel to explore the effects of alcohol or drug use on the decedent as a means to buttress the testimony of petitioner about decedent's aggressive, irrational behavior and the necessity of multiple shots to stop the alleged victim. Petitioner produces an expert witness, Adel Shaker, M. D. who testified that a blood alcohol level of that magnitude would produce a violent personality, obvious drunkenness and slower reaction for simple tasks. (HC Deposition - 9). He further testified that the effects of

51

A1042

fluids given Ricardo Lee at the hospital could possibly have flushed out cocaine and any other medication. He praised the work of the West Virginia Medical Officer. On cross-examination the doctor stated that those issues are somewhat common sense and the specifics he referred do not work the same way for everyone. (HC Deposition 12-22).

Crawford v. Washington, 541 U.S. 36, held that the Confrontation Clause generally prohibits the introduction of "testimonial" statements by a nontestifying witness, unless the witness is unavailable to testify and the defendant had had a prior opportunity for cross examination. A statement qualifies as testimonial if the "primary purpose" of the conversation was to create an out-of-court substitute for trial testimony. However, that does not mean that the Confrontation Clause bars every statement that satisfies the "primary purpose" test. The Court has recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. Ohio v. Clark, ____ S.Ct. ____, Decided June 18, 2015.

More on point with the principal case is Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011) wherein the concept of Crawford was extended to blood analysis and other areas. The issue in this case is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification made for the purpose of proving a particular fact. The Court held that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

In this particular case in the forensic report itself was never formally introduced into evidence. However, there were references to the knife. Lt. Helton said he looked at the knife and could find no fingerprints and there was also references of intoxication at a .17 level. It appears that references to the reports were purely hearsay, but, both parties seemed to want them to be before the jury. This must be balanced with the statements of Ms. French that they knew all along that this was a self defense and defense of home case, wherein Petitioner admitted on a radio broadcast that he shot and killed Ricardo Lee.

3. Trial counsel was ineffective in numerous additional areas:

52

A1243

(a). Insufficient communication with the petitioner. How much face to face contact is a public defender supposed to have with a defendant who admits he shot another person and they have witness statements from everyone who saw the event? In the principal case there were at least three face to face visits at the Corrections Center and several telephonic and written communications.

An indictment was returned in this matter in February of 2006 and his case was tried on August 29, 2006. Ms. French traveled to the State facility to visit with Petitioner on 4 occasions and had numerous telephone conversations with him. Given the facts of the case, it would seem reasonable time was spent with the Petitioner and the attorney testified that she saw that there was nothing she could do about his attitude. Can one predetermine how many hours she should have spent, personally, with the defendant to insure a favorable verdict? I think not. Neither could the Court put a predetermined length of time needed by Counsel to prepare as preparation time will vary greatly and what may be reasonable time in one case could be quite un reasonable in another. United States v. Ray, 351 F.2d 554 (1965).

(b). Insufficient description of the crime scene to the jury. There was no case law cited in support of this argument. The record is clear that Ms. French contemplated a jury view, but when the trial began she and the State's attorney marked the room off in the court room floor and none of the witnesses, including Petitioner. seemed to have a problem relating those issues to the jury. There were also diagrams and photographs.

(c). Ineffective challenging of inaccuracies related to the positioning of the decedent at the crime scene. Everyone who testified seemed to have a different opinion as to the position of the body, but all agreed one could not open the door to get inside. Mark Heaton testified he could not open the door to get out, Officers Whitt and Brooks disagreed as to whether Lee was against the front door and whether the door hit Ricardo Lee when you attempted to open it. However, all witnesses present agreed that Ricardo Lee was inside the house.

(d). Ineffective in preventing the introduction of tremendous amounts of hearsay. The examples put forth included the testimony of Ethel Adams, Pat Adams, David Pleasants, Jim Taylor and Trusby Hubbard. This testimony related to the Petitioner's alleged statement that he would kill himself a nigger son-of-a-bitch. All of these witnesses, except Ethel Adams, testified at the trial.

53

With regard to the Adams testimony, the officer said he talked with Pat and Ethel Adams and they related information to him. However, Ethel Adams was presumably included in the word "they" and she did not testify at the trial. Therefore, I do not believe including her by using the word " they" that the comment would rise to the level of prejudicial error. There was no cases cited with regard to this issue. Ethel Adams was prevented from testifying because Ms. French did not dig too deep into the cross-examination of Pat Adams. Intense cross-examination would permit the State to put on a Ethel Adams to testify and she could be understood.

(e). Trial Counsel allowed the prosecutor to assert that petitioner's wife had cleaned up the trial scene, even though no evidence to that fact was offered at trial. This is an accurate statement if you do not read his statement in its entirety and do not consider the fact that Petitioner said that Mr. Taylor cleaned up the blood during his testimony at the Habeas Corpus hearing.

In his opening statement Mr. Sitler said "... a person in the operating room was Mr. Hubbard's wife. She had a key. She left work. Whe went back to the scene and probably cleaned things up a little bit. Everything was not perfectly preserved." (Tr. Vol. 1, 138). In the Habeas Corpus hearing Petitioner testified that it was Jimmy Taylor who cleaned up the blood and not his wife. (HC-125). The relevancy of this issue, if there was any, was whether or not someone cleaned up blood and not who did the cleaning. However, Ms. French believed this was irrelevant in that her client shot Ricardo Lee 10 times and admitted so doing. No case law was cited on this issue.

The Judge even advised the jurors that the opening statements of the lawyers were not evidence. (Tr. Vol. 1-113).

(f). Trial counsel ineffectively allowed the prosecutor to offer opinion evidence without a proper foundation. Petitioner alleges that the State offered opinion evidence from the medical examiner that the lack of blood on the decedent's shoes showed he hadn't been moving during the incident and one bullet wound to the decedent's arm was possibly defensive.

When asked why one would look at the bottom of the shoes, the medical examiner answered that sometimes the examination will indicate whether the decedent was walking in his own blood or not. He then stated that the bottom of the shoes were clean and therefore the deceased did not walk in his own blood.

He further testified that it is possible that an arm wound could be defensive.

Expert witnesses are permitted to express their opinions and can speculate with regard to the facts found in a case. The test is not whether or not the opinions are harmful to a defendants case, but whether case law exists to say voicing the opinions are improper and no such case was cited.

(g). The trial counsel ineffectively failed to seek a mistrial when the prosecutor challenged why witness Frazier was not present to testify. Trial Counsel for defendant objected and the State alleged that Mr. Frazier was a State's witness and the defense should not be permitted to object. The trial judge found that the comment about the witness failing to appear merited a curative instruction. The trial judge pointed out the fact that the jury did not know whose witness Frazier was and he proceeded to give a curative instruction.

He told the jury to disregard the last remark and that any implication that a defendant had a burden to bring anyone into court or do anything, is not accurate. The fact that the witness was absent was not to be considered by the jury in any way and it should not be held against the defendant.

The court believes that such an isolated incident that was not deliberately placed before the jury did not prejudice the defendant in this particular case. The only evidence that would have been presented by Mr. Frazier was that Ricardo Lee smoked crack and that Ricardo Lee tried to sell him a knife on the day of the hearing and that evidence had been presented already. This coupled with the court's curative instruction rendered any prejudice as harmless error.

(h) Trial Counsel was ineffective in presenting R. 404(b) evidence from coming in without the required showings. The State solicited evidence that the police had been to the Hubbard residence on numerous previous occasions for disturbances and it was not challenged by trial counsel.

WVRE 404(b), is entitled Crimes, Wrongs, or other acts. It provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on particular occasion the person acted in accordance with the character. Petitioner contends that the prosecution solicited testimony that the police had been to the Hubbard residence on numerous previous occasions for disturbances. He believes this testimony should have been

55

A1341.

challenged by trial counsel. The reference (Ex. 4 at 29 - 32) for this prosecutorial allegation was not the question by the prosecutor, but the defense counsel, Ms. French. This question was consistent with attempting to show that Ricardo Lee was a neighborhood nuisance and that Petitioner had called the law on him on previous occasions. This was the trial tactic of Ms. French. The Court concludes that, under the present circumstances, this cannot be viewed as 404(b) evidence.

This question also opened the door for the State to follow up on this line of questioning. The questioning had no relationship to the character of the Petitioner, but bolstered his defense, if anything, of living in a bad neighborhood. It is relevant to note that this evidence had nothing to do with proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. This evidence was not proposed by the State. State v. McGinnis, 193 W. Va. 147, 455 S.E.2d 516, (1994).

## CONSTITUTIONAL ERRORS IN EVIDENTIARY RULINGS

This allegation relates to the continuance ruling and statements made by the State at trial when the Court offered a curative instruction. It also relates to the issue that the Court required the State to produce statements after the testimony of witnesses and the Court giving Ms. French the opportunity to talk to the witnesses prior to her cross-examinatin. This Court does not see any error in these instances.

## EXCESSIVENESS OR DENIAL OF BAIL.

U. S. Const. Amend. VIII, provides "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The only evidence in this matter was, "And the bail in this case, was it set at an amount that you could reasonable (sic) reach?" The answer to the question was, "No". This Court does not have any evidence or case to bolster a definitive decision on this particular issue. (HC-139).

## REFUSAL TO SUBPOENA WITNESSES

This issue is raised because Ms. French did not subpoena witnesses to further testify as to the bad reputation of Ricardo Lee.

The main thrust and strategy of this case was self-defense. Anything outside that issue was surplusage. However, the bad reputation of Ricardo Lee, was relevant and needed to be

56

addressed.

The bad reputation of Ricardo Lee was adequately placed before the jury by the testimony of Dennis Hubbard, Trusby Hubbard, Mark Heaton, David Pleasants, Pat Adams, and Jimmy Ray Taylor. Their testimony cumulatively established that Ricardo Lee had a knife on the day in question, always carried a knife, a knife was found at the scene, walked into people's houses and refused to leave, he was a thief, smoked marijuana, smoked crack, had prior physical altercations, frequently was intoxicated, threatened some with violence, fighting and was a general nuisance in the community. There was not one person who testified in the trial that had anything good to say about Ricardo Lee.

There were other witnesses who would testify to the same character traits, but Ms. French thought she had enough. A conviction of her client was probably beyond her wildest dreams and Courts do not allow a steady stream of witnesses to testify to the same facts. Therefore, it is the opinion of this Court that the bad reputation of the deceased was adequately proven by the witnesses who testified. Dietz v. Legursky, *Supra.*

## THE PASSAGE OF "CASTLE DOCTRINE" LEGISLATION, A FAVORABLE CHANGE IN THE LAW WITH RETROACTIVE EFFECT, REQUIRES A NEW TRIAL.

Petitioner alleges that the passage of W. Va. Code, ch. 55, art. 7, §22, grants immunity to persons falling within its purview. He states that the statute provides that a person may use reasonable and proportionate force, including deadly force, against an intruder in his home if the person reasonably believes the intruder intends to kill or seriously harm a household resident, or that the intruder intends to commit another felony and the person reasonably believes deadly force is necessary. He further states that changes in the law since its passage in 2008 would be applicable to his case because it would be retroactive. Jones v. Warden, 161 W. Va. 168, 241 S. E. 2d 914 (1978).

W. Va. Code, ch. 55, art. 7, §22, cited by the Petitioner, was enacted by the West Virginia Legislature in 2004 and subsequently amended in 2008. The title of the provision is "Civil relief for persons resisting certain criminal activities". This section does not use the term "castle doctrine" in its body. Many other states use this term and it usually applies in criminal prosecutions pursuant to criminal statutes.

A1248

In West Virginia, it has been mentioned in several cases by stating that as a general proposition our precedent in self-defense cases clearly states what where an unlawful intrusion has occurred in the sanctity of one's home, an occupant of the home has no duty to retreat. This has been generally described as the "castle" doctrine, "castle" rule or "home" rule. Our precedent succinctly states that " a man attacked in his own home by an intruder may invoke the law of self defense without retreating." State v. Preece, 116 W. Va. 176, 179 S.E. 524 (1935); State v. W.J.B., 166 W. Va. 602, 276 S.E.2d 550 (1981); State v. Harden, 223 W. Va. 796, 679 S.E.2d 628 (2009).

The last instruction given by the Court in this case is a self defense instruction in which the following statement is embedded, " A person in his own home who is subject to an unlawful intrusion and placed in immediate danger of serious bodily harm or death has no duty to retreat but may remain in place and employ deadly force to defend himself."

Obviously the issue of self defense is for a jury determination. The shadow cast in this case are the facts that Ricardo Lee was a somewhat frequent visitor to the Petitioner's home to see Trusby Hubbard and on more than one occasion stopped to talk with Petitioner. When this is added to the fact that there was evidence Petitioner made the statement to the effect that he was going to kill him a son-of-a-bitch nigger, it gives the jury something to think about in reaching its decision.

The State is of the opinion that W. Va. Code ch. 55, art. 7, §22 in its body does not apply to a criminal case. It deals with civil relief and if the legislature wanted it to apply to a criminal case, it would have passed a separate law. In short, it does not provide a criminal defense nor does it permit a homeowner to shoot any unwanted visitor to his home.

The Court is of the opinion that the instructions given on the law of self defense in the State of West Virginia were accurate. The Court further instructed the jury that there were two theories of self defense which were self-defense of one's person and self-defense of one's home that applied in this case. In this case the jury rejected both the defense theory of self defense of person and self defense of one's home. They found that there was no immunity that would permit an individual to shoot anyone in his home who was invited or uninvited. Therefore, the Court is of the opinion the W. Va. Code, ch. 55, art. 7, § 22, is not applicable to this case.

58

A1279

## REFUSAL OF CONTINUANCE AND CLAIMS OF PREJUDICIAL STATEMENT BY TRIAL JUDGE

It appears that these two grounds apply to the refusal to continue the case because Andre Frazier could not be found for the trial. Frazier gave a statement to the effect that Ricardo Lee tried to sell him a knife on the day of the shooting and he was impaired. The evidence in the case was that other people testified to the same facts and his testimony would have been cumulative at best. The Court declined to continue a murder trial because the defense could not find two (2) witnesses and the family needed closure.

It is a general rule in West Virginia that whether or not a continuance is to be granted is within the sound discretion of the trial Court. A party proposing a continuance based upon the ground of unavailability of a witness must show that the witness has important and material evidence, that the party has exercised due diligence to obtain the presence of the witness, there is a good possibility that the testimony will be secured at a later date and the postponement would not cause an unreasonable delay or disrupt the process of justice.

Based upon the testimony during the trial, Andre Frazier was a crack dealer who lived in a "crack house" next door to the Petitioner. After being interviewed by the Police Department he appears to have vanished and would never be available to testify. Furthermore, he would testify that Ricardo Lee was impaired and tried to sell him a knife or two on the day of the shooting. Many of the witnesses testified to similar facts. State v. Snider, 196 W. Va. 513, 474 W.E.2d 180 (1996). Obviously he was also not available to testify for the Habeas Corpus hearing. I find that the Court did not err in refusing the motion for continuance.

## CLAIMS OF PREJUDICIAL STATEMENTS BY TRIAL JUDGE ( Regarding continuance)

This is not specific enough to address other than what was written in the preceding paragraphs. However, the statement Petitioner alleges the judge said at the sentencing was, "You disgust me" and that he failed to grant a continuance.( HC-140). The continuance issue has been dealt with and a review of the sentencing hearing is helpful.

Toward the end of the hearing on page 39 of the Transcript of the Sentencing Hearing, the Court said, "....in those cases like that when it's a true self-defense normally the Defendant is one of the first people that's trying to render aid or is, you know, upset about it and shows some

59

ⱭⱤⱭⴹⱭ

degree of remorse. I haven't seen any out of you. I mean, you just think this is you know, —he came onto your property and you just shot him ten times and you were proud of that, I mean, you know, that —that's just—that— that's really— it's—it's frankly disgusting. I mean, it's disgusting."

I do not believe the Court called the Petitioner a disgusting person. I believe that is the feeling he got when he thought of the entire set of circumstances. However, the trial was over and regardless of what context you put the Court's remarks in, it is not a violation of Petitioner's constitutional rights. In Habeas Corpus proceedings only errors of constitutional or jurisdictional magnitude are cognizable. Therefore, the Court finds no error in this claim.

## SUFFICIENCY OF EVIDENCE.

Petitioner alleges that there was insufficient evidence resulting in his conviction. He believes he was in his home, Ricardo Lee forced his way into his home and based upon the castle doctrine he had the right to kill him and be found immune from prosecution. The law does give him a right to a jury trial and the right to assert the right of self defense. Once that defense is asserted the burden shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self defense. It becomes a jury question as to whether the defense was valid.

Everyone in the house at the time of the shooting testified as to the facts, the defendant testified and nobody testified for Ricardo Lee. Yet the jury found in favor of the State and they convicted the Petitioner of second degree murder. In State v. Hughes, 197 W. Va. 518, 476 S.E.2d 189 (1996) the Court set forth the defense of self-defense which would determine a killing to be excusable, but the jury obviously did not find that the conduct of Petitioner met that standard.

*Hughs* is generally a sufficiency of evidence case. The Court should review the evidence admitted at trial to determine whether that evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. The jury weighed all of the evidence and found the Petitioner guilty of second degree murder.

A reviewing Court must review all of the evidence, whether direct or circumstantial, in

60

A1251

the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. Credibility determinations are for a jury and not a Court. Finally, the jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. This was a somewhat similar case to the example Judge Swope gave during voir dire in which a homeowner shot through a door. The Court does not believe the Petitioner sustained the burden of proof required by *Hughs.*

## EXCESSIVE SENTENCE.

On September 1, 2006, a Mercer County, West Virginia, jury found the Petitioner guilty of the crime of Murder in the second degree. The statutory penalty for such an offense was punishment by a definite term of imprisonment in the penitentiary which is not less than ten nor more than forty years. He would be eligible for parole after serving a minimum of ten years. W. Va. Code, ch. 61, art. 2, § 3.

On October 23, 2006, Petitioner was sentenced to Forty years in the Penitentiary, which was the maximum sentence. Sentences that do not exceed the statutory maximum are not review able. State v. Hambleton (No. 14-0225, March 2015).

## NO PRELIMINARY HEARING.

Petitioner complains that he did not receive a preliminary hearing before a Mercer County, Magistrate pursuant to W. Va.R.Crim.P. 5. This is an accurate representation. His case was presented to a Mercer County, West Virginia, grand jury and a true bill or indictment was returned against Petitioner.

In West Virginia, a preliminary examination is not constitutionally required. Desper v. State, 173 W. Va. 494, 318 S.E.2d 437 (1984); Peyatt v. Kopp, 428 S.E.2d 535 (1993).

## PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EFFECTS OF CUMULATIVE ERROR.

Plaintiff alleges that in the case at bar the substantial number of errors concerning

A1252

significant aspects of the case warrant a finding that petitioner's trial was unfair. State v. Smith, 156 385, 193 S.E.2d 550 (1972). Petitioner assumes that the Court will find a substantial number of errors. This is not the case in this consideration of the conviction. *Smith* was a case of unquestionable errors committed during the trial of Larry Eugene Smith, any one of which would have required a new trial. These errors were clear, substantial and could be considered prejudicial. The defendant Smith assigned sixteen grounds of error claimed to have been committed during the trial. Certain alleged errors, if standing alone, would be considered harmless error, and would not constitute grounds for reversal. However, certain other errors assigned by Smith did constitute reversible error. The Court does not believe the harmless error analysis would be appropriate in this consideration. Therefore, the Court does not believe the argument of cumulative error is valid in this case.

## DECISION

Based upon the underlying trial transcript, sentencing hearing transcript, habeas corpus evidentiary hearing, exhibits presented, memoranda of law provided by counsel and oral arguments the Court hereby **ORDERS** as follows.

(1) The Amended Writ of Habeas Corpus Ad Subjiciendum sought by the Petitioner, Dennis Gale Hubbard, is hereby **DENIED**.

(2) It is further **ORDERED** that the Clerk of the Circuit Court of Mercer County, West Virginia remove this case from the docket of the Court.

(3) It is further **ORDERED** that the Clerk of the Circuit Court of Mercer County, West Virginia, send an attested copy of this Order to the following persons.

(a) Paul Cassell, Esq., 340 West Monroe Street, Wytheville, VA, 24382

(b) Scott Ash, Esq., Prosecuting Attorney, 1501 W. Main Street, Princeton, WV 24740.

(4) It is further **ORDERED** that should Petitioner decide to appeal this decision to the West Virginia Supreme Court of Appeals he must file a Notice of Appeal to said Court within the period of 30 days after the entry of this Order and perfect the appeal to said Court within the period of 4 months.

To all of which the Petitioner, Dennis Gale Hubbard, objects and takes exception.

Date: January 15, 2016.

Enter:

_John S. Hrko_

John S. Hrko, Special Judge

THE FOREGOING IS AN ATTESTED COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE _____ DAY
OF _____ 20
DATED THIS _____ DAY OF _____
20 _____

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV

BY _____
HER DEPUTY

63

A1254